## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>Plaintiff,<br><br>v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.----

## COMPLAINT

Plaintiff Mosaid Technologies Incorporated ("Mosaid"), for its complaint against defendant the Honorable David Kappos, states as follows:

1. This is an action by the owner of United States Patent No. 7,522,714 ("the '714 patent") seeking review of inaccurate and erroneous patent term adjustment calculations made by the United States Patent and Trademark Office ("USPTO"). Specifically, this is an action by Plaintiffs under 35 U.S.C. § 154(b)(4)(A) seeking a judgment that the patent term adjustment of 593 days calculated by the USPTO for the '714 patent should be corrected to 679 days.

2. This action arises under 35 U.S.C. § 154 and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

1

## I. THE PARTIES

3.    Plaintiff Mosaid is a company operating under the laws of Canada.  Mosaid is located at 11
      Hines Road Suite 203 Ottawa, Canada K2k 2x1.

4.    Defendant David Kappos is the Under Secretary of Commerce for Intellectual Property and
      Director of the United States Patent and Trademark Office.  Defendant is sued in his official
      capacity.

## II. JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action and is authorized to issue the requested relief to
      Plaintiff pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1361; 35 U.S.C. § 154(b)(4)(A) and 5
      U.S.C. §§ 701-706.

6.    Venue is proper in this district pursuant to 35 U.S.C. § 154(b)(4)(A).

7.    This Complaint is being timely filed in accordance with 35 U.S.C. § 154(b)(4)(A) and FRCP
      6(a)(3).

## III. BACKGROUND

8.    The '714 patent issued to Yehuda Binder on April 21, 2009, based on patent application
      number 11/338,855, filed on January 25, 2006, which is a continuation of U.S. Patent
      Application No. 10/827,349, filed on April 20, 2004, now U.S. Patent No. 7,123,701,
      which is a continuation of U.S. Patent Application No. 10/412,251, filed on April 14,
      2003, now U.S. Patent No. 6,757,368, which is a continuation of U.S. Patent Application
      No. 09/531,692, filed on March 20, 2000, now U.S. Patent No. 6,549,616.  The '714
      patent is attached hereto as Exhibit A.

9.    Plaintiff Mosaid is the assignee of the '714 patent and is the real party in interest in this case,
      as evidenced by an assignment document from the inventors to Serconet Ltd., recorded in the
      USPTO on July 7, 2000, at Reel/Frame 010908/0396, in connection with parent U.S. Patent

2

Application No. 09/531,692, which assignment included continuations of that parent application, and an assignment document from Serconet Ltd. to Mosaid, recorded in the USPTO on March 25, 2009, at Reel/Frame 022449/0101.

10.   When the USPTO issued the '714 patent on April 21, 2009, it erroneously calculated the entitled patent term adjustment ("PTA") for the '714 patent as 593 days. Had the USPTO calculated the entitled patent term adjustment properly, the '714 patent would be entitled to 679 days of patent term adjustment.

11.   The errors in the USPTO's patent term adjustment calculations are detailed in a recent order from the U. S. District Court for the District of Columbia in an action titled *Wyeth* v. *Dudas,* 580 F. Supp. 2d 138 (D.D.C. Sept. 30, 2008), where the Court granted summary judgment against the USPTO, holding that the USPTO's patent term adjustment calculation methodology was erroneous as a matter of law and inconsistent with the Patent Statute.

12.   The correct patent term adjustment methodology identified in the prior *Wyeth* v. *Dudas* action governs the USPTO's calculation of patent term adjustment for Plaintiff's '714 patent.

### IV. COUNT I:  U.S. PATENT NO. 7,522,714

13.   Plaintiff incorporates by reference the allegations in paragraphs 1-12 above, as if fully set forth herein.

14.   During prosecution of the '714 patent, the patent owner accrued 593 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(A), and accrued 86 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(B).

15.   Under the USPTO's interpretation of 35 U.S.C. § 154, all PTA accrued under 35 U.S.C. § 154(b)(l)(A) and all PTA accrued under 35 U.S.C. § 154(b)(l)(B) inherently overlaps and, thus, it has been the USPTO position that a patent holder is only eligible for the larger of these two amounts of PTA, 593 days. For the '714 patent, the USPTO erroneously limited

the patent term adjustment for the '714 patent to 593 days (*see* calculation in paragraph 21, below), as shown on the face of the '714 patent.

16. In view of a recent decision from this Court (*Wyeth v. Dudas, supra*), all days on which 35 U.S.C. § 154(b)(1)(A) or 35 U.S.C. § 154(b)(l)(B) apply should accrue patent term adjustment for the '714 patent.

17. Each day from the day after March 25, 2007 (14 months from the 371(c) date) through to the issuance of a first action Notice of Allowance on November 7, 2008, qualify for patent term adjustment under 35 U.S.C. § 154(b)(1)(A), a total of 593 days.

18. Furthermore, each day from the day after January 25, 2009 (3 years from the actual filing date in the United States) through to the date of issue on April 21, 2009, qualify for patent term adjustment under 35 U.S.C. § 154(b)(l)(B), a total of 86 days.

19. Under the interpretation of this Court (*Wyeth v. Dudas, supra*), there is no actual calendar days overlap between the time periods of delay calculated under 35 U.S.C. § 154(b)(1)(A) and 35 U.S.C. § 154(b)(1)(B), and the total USPTO prosecution delay is accordingly 593 + 86 = 679 days, minus any period attributed to disclaimed term or applicant's delay under 35 U.S.C. § (154(b)(2)(B) or (C).

20. Plaintiff agrees with the USPTO's holding of a total applicant prosecution delay of 0 days under 35 U.S.C. § 154(b)(2)(B) or (C).

21. Under the USPTO's interpretation, the USPTO had calculated an erroneous patent term adjustment of 593-0 = 593 days.

22. The correct overall Patent Term Adjustment accrued by the patent holder is 679-0 = **679 days**, and the patent holder is therefore entitled to 679 - 593 = **86 ADDITIONAL days** of patent term adjustment.

4

23.     On June 22, 2009, Plaintiff filed a request for reconsideration of patent term adjustment in

the USPTO (Exhibit B), which set forth the basis for Plaintiff's determination that the PTA

was incorrect.  By decision mailed on August 20, 2009 (Exhibit C), the request was

dismissed and no adjustment was made.

WHEREFORE, Plaintiff respectfully prays that this Court:

A.     Issue an Order changing the period of patent term adjustment for the '714 patent term

from 593 days to 679 days and requiring Defendant to alter the terms of the '714 patent to reflect the

679 days of actual patent term adjustment due the '714 patent.

B.     Grant such other and further relief as the nature of the case may admit or require and

as may be just and equitable.

Dated: October 19, 2009

                                        Respectfully submitted,

                                        MOSAID TECHNOLOGIES INCORPORATED

                                        By: _____
                                            Roger L. Browdy (DC Bar No. 164,251)
                                            Ronni S. Jillions (DC Bar No. 375,817)
                                            BROWDY AND NEIMARK, P.L.L.C
                                            624 Ninth Street, N.W.
                                            Washington, DC 20001
                                            Tel.:  (202) 628-5197
                                            Fax:  (202) 737-3528
                                            Email:  rlbrowdy@browdyneimark.com
                                                    rsjillions@browdyneimark.com

                                        Attorneys for Plaintiff

Address for mail:
BROWDY AND NEIMARK, P.L.L.C.
624 Ninth Street, NW
Washington, DC 20001
(202) 202-628-5197

G:\INT\MosaidvDoll\Binder7c\2009-10-19 Complaint Mosaid BINDER7C.doc

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>              Plaintiff,<br><br>                        v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. ---- |

# Exhibit A

US007522714B2

(12) **United States Patent**
Binder

(10) **Patent No.:** **US 7,522,714 B2**
(45) **Date of Patent:** **Apr. 21, 2009**

(54) **TELEPHONE OUTLET FOR IMPLEMENTING A LOCAL AREA NETWORK OVER TELEPHONE LINES AND A LOCAL AREA NETWORK USING SUCH OUTLETS**

(75) Inventor: **Yehuda Binder**, Hod Hasharon (IL)

(73) Assignee: **Serconet Ltd.**, Ráanana (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 593 days.

(21) Appl. No.: **11/338,855**

(22) Filed: **Jan. 25, 2006**

(65) **Prior Publication Data**

US 2006/0133588 A1     Jun. 22, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/827,349, filed on Apr. 20, 2004, now Pat. No. 7,123,701, which is a continuation of application No. 10/412,251, filed on Apr. 14, 2003, now Pat. No. 6,757,368, which is a continuation of application No. 09/531,692, filed on Mar. 20, 2000, now Pat. No. 6,549,616.

(51) **Int. Cl.**
*H04M 11/00* (2006.01)

(52) **U.S. Cl.** .................................. 379/90.01; 379/93.08

(58) **Field of Classification Search** .... 379/90.01–93.08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,264,395 | A | 12/1941 | Mitchell |
| 2,264,396 | A | 12/1941 | Moore |
| 2,510,273 | A | 6/1950 | Barstow et al. |
| 2,516,211 | A | 7/1950 | Hochgraf |
| 2,568,342 | A | 9/1951 | Koehler et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1 009 156 A2 | 6/2000 | |

(Continued)

OTHER PUBLICATIONS

"The DSL Sourcebook", Paradyne Corporation, Copyright 2000, DSL-BOOK-3.0-0900, 98 pages.

(Continued)

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Maria El-Zoobi
(74) *Attorney, Agent, or Firm*—Browdy and Neimark, P.L.L.C.

(57) **ABSTRACT**

A network for transporting power and multiplexed data and digital telephone signals. The network includes at least three nodes and first and second wiring segments in a building for carrying the multiplexed data and digital telephone signals, and at least one of the segments is configured to additionally carry a power signal. A power consuming component is connected to the at least one wiring segment and is powered by the power signal carried by that segment. Each wiring segment connects a different pair of the nodes together to form, with nodes nodes, a packet based bi-directional communication link. One of the nodes contains communication link composed of a repeater, a bridge, or a router connectable to a data unit. At least one of the nodes is connected to a remote data unit external to the building for coupling the remote data unit to at least one of said communication links.

**52 Claims, 11 Drawing Sheets**



## US 7,522,714 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| 2,680,162 A | 6/1954 | Brehm et al. | 4,577,311 A | 3/1986 | Duquesne et al. |
| 3,280,259 A | 10/1966 | Cotter | 4,577,314 A | 3/1986 | Chu et al. |
| 3,369,078 A | 2/1968 | Stradley | 4,578,533 A | 3/1986 | Pierce |
| 3,406,344 A | 10/1968 | Hopper | 4,578,535 A | 3/1986 | Simmons |
| 3,511,936 A | 5/1970 | Saltzberg | 4,578,540 A | 3/1986 | Borg et al. |
| 3,529,088 A | 9/1970 | Hauer | 4,580,291 A | 4/1986 | ab der Halden |
| 3,539,727 A | 11/1970 | Pasternack | 4,583,214 A | 4/1986 | Miyashiita et al. |
| 3,651,471 A | 3/1972 | Hasselwood et al. | 4,584,690 A | 4/1986 | Cafiero et al. |
| 3,699,523 A | 10/1972 | Percher | 4,592,069 A | 5/1986 | Redding |
| 3,723,653 A | 3/1973 | Tatsuzawa | 4,593,389 A | 6/1986 | Wurzburg et al. |
| 3,835,334 A | 9/1974 | Notteau | 4,597,077 A | 6/1986 | Nelson et al. |
| 3,870,822 A | 3/1975 | Matthews | 4,604,741 A | 8/1986 | Barsellotti |
| 3,872,253 A | 3/1975 | Jurschak | 4,608,686 A | 8/1986 | Barsellotti |
| 3,873,771 A | 3/1975 | Kleinerman et al. | 4,631,367 A | 12/1986 | Coviello et al. |
| 3,875,339 A | 4/1975 | Gruen et al. | 4,639,714 A | 1/1987 | Crowe |
| 3,876,984 A | 4/1975 | Chertok | 4,642,607 A | 2/1987 | Strom et al. |
| 3,922,490 A | 11/1975 | Pettis | 4,644,526 A | 2/1987 | Wu |
| 3,937,889 A | 2/1976 | Bell, III et al. | 4,646,289 A | 2/1987 | Tsiakas et al. |
| 3,949,172 A | 4/1976 | Brown et al. | 4,646,296 A | 2/1987 | Bartholet et al. |
| 3,968,333 A | 7/1976 | Simokat et al. | 4,649,551 A | 3/1987 | Sander et al. |
| 3,992,589 A | 11/1976 | Kuegler | 4,656,655 A | 4/1987 | Hashimoto |
| 4,008,369 A | 2/1977 | Theurer et al. | 4,665,516 A | 5/1987 | Middleton et al. |
| 4,035,838 A | 7/1977 | Bassani et al. | 4,670,870 A | 6/1987 | Hewinson et al. |
| 4,054,910 A | 10/1977 | Chou et al. | 4,670,874 A | 6/1987 | Sato et al. |
| 4,058,678 A | 11/1977 | Dunn et al. | 4,672,602 A | 6/1987 | Hargrave et al. |
| 4,171,467 A | 10/1979 | Evenchik | 4,672,605 A | 6/1987 | Hustig et al. |
| 4,197,431 A | 4/1980 | Vis | 4,677,646 A | 6/1987 | Dodds et al. |
| 4,206,320 A | 6/1980 | Keasler et al. | 4,679,227 A | 7/1987 | Hughes-Hartogs |
| 4,232,200 A | 11/1980 | Hestad et al. | 4,691,344 A | 9/1987 | Brown et al. |
| 4,241,243 A | 12/1980 | Ball | 4,701,945 A | 10/1987 | Pedigo |
| 4,262,171 A | 4/1981 | Schneider et al. | 4,703,499 A | 10/1987 | Fossas et al. |
| 4,302,629 A | 11/1981 | Foulkes et al. | 4,709,412 A | 11/1987 | Seymour et al. |
| 4,328,579 A | 5/1982 | Hashimoto et al. | 4,724,435 A | 2/1988 | Moses et al. |
| 4,332,980 A | 6/1982 | Reynolds et al. | 4,731,821 A | 3/1988 | Jackson, III |
| 4,339,816 A | 7/1982 | Reed | 4,733,380 A | 3/1988 | Havira |
| 4,367,548 A | 1/1983 | Cotten, Jr. et al. | 4,733,389 A | 3/1988 | Puvogel |
| 4,373,117 A | 2/1983 | Pierce | 4,734,932 A | 3/1988 | Lott |
| 4,378,470 A | 3/1983 | Murto et al. | 4,742,538 A | 5/1988 | Szlam |
| 4,380,009 A | 4/1983 | Long et al. | 4,754,326 A | 6/1988 | Kram et al. |
| 4,387,271 A | 6/1983 | Artom | 4,757,495 A | 7/1988 | Decker et al. |
| 4,388,489 A | 6/1983 | Wigan et al. | 4,757,497 A | 7/1988 | Beierle et al. |
| 4,393,508 A | 7/1983 | Boudault | 4,761,646 A | 8/1988 | Choquet et al. |
| 4,395,590 A | 7/1983 | Pierce | 4,764,922 A | 8/1988 | Dieter et al. |
| 4,415,774 A | 11/1983 | Driver | 4,766,402 A | 8/1988 | Crane |
| 4,417,099 A | 11/1983 | Pierce | 4,768,110 A | 8/1988 | Dunlap et al. |
| 4,425,642 A | 1/1984 | Moses et al. | 4,768,206 A | 8/1988 | Van Gerwen |
| 4,431,869 A | 2/1984 | Sweet | 4,769,837 A | 9/1988 | McCormick et al. |
| 4,433,212 A | 2/1984 | Moses et al. | 4,772,870 A | 9/1988 | Reyes |
| 4,442,320 A | 4/1984 | James et al. | 4,776,006 A | 10/1988 | Comerford et al. |
| 4,442,540 A | 4/1984 | Allen | 4,780,757 A | 10/1988 | Bryer et al. |
| 4,443,662 A | 4/1984 | Nakhla | 4,780,758 A | 10/1988 | Lin et al. |
| 4,444,999 A | 4/1984 | Sparrevohn | 4,785,448 A | 11/1988 | Reichert et al. |
| 4,449,218 A | 5/1984 | Strehl | 4,785,472 A | 11/1988 | Shapiro |
| 4,456,985 A | 6/1984 | Carsten et al. | 4,789,895 A | 12/1988 | Mustafa et al. |
| 4,456,986 A | 6/1984 | Carsten et al. | 4,789,994 A | 12/1988 | Randall et al. |
| 4,459,434 A | 7/1984 | Benning et al. | 4,799,213 A | 1/1989 | Fitzgerald |
| 4,475,193 A | 10/1984 | Brown | 4,803,719 A | 2/1989 | Ulrich |
| 4,479,033 A | 10/1984 | Brown et al. | 4,807,225 A | 2/1989 | Fitch |
| 4,485,400 A | 11/1984 | Lemelson et al. | 4,815,106 A | 3/1989 | Propp et al. |
| 4,493,948 A | 1/1985 | Sues et al. | 4,821,319 A | 4/1989 | Middleton et al. |
| 4,500,751 A | 2/1985 | Darland et al. | 4,825,435 A | 4/1989 | Amundsen et al. |
| 4,506,387 A | 3/1985 | Walter | 4,829,570 A | 5/1989 | Schotz |
| 4,507,721 A | 3/1985 | Yamano et al. | 4,837,799 A | 6/1989 | Prohs et al. |
| 4,514,594 A | 4/1985 | Brown et al. | 4,839,743 A | 6/1989 | Best et al. |
| 4,521,881 A | 6/1985 | Stapleford et al. | 4,843,606 A | 6/1989 | Bux et al. |
| 4,523,307 A | 6/1985 | Brown et al. | 4,847,903 A | 7/1989 | Schotz |
| 4,528,422 A | 7/1985 | Cupani | 4,849,811 A | 7/1989 | Kleinerman |
| 4,543,450 A | 9/1985 | Brandt | 4,866,602 A | 9/1989 | Hall |
| 4,546,212 A | 10/1985 | Crowder, Sr. | 4,866,704 A | 9/1989 | Bergman |
| 4,561,020 A | 12/1985 | Matsuda | 4,882,747 A | 11/1989 | Williams |
| 4,564,940 A | 1/1986 | Yahata | 4,885,747 A | 12/1989 | Foglia |
| | | | 4,885,766 A | 12/1989 | Yasuoka et al. |
| | | | 4,888,795 A | 12/1989 | Ando et al. |

**US 7,522,714 B2**

Page 3

| | | |
|---|---|---|
| 4,890,316 A | 12/1989 | Walsh et al. |
| 4,893,326 A | 1/1990 | Duran et al. |
| 4,901,342 A | 2/1990 | Jones |
| 4,918,688 A | 4/1990 | Krause et al. |
| 4,918,690 A | 4/1990 | Markkula, Jr. et al. |
| 4,924,492 A | 5/1990 | Gitlin et al. |
| 4,932,022 A | 6/1990 | Keeney et al. |
| 4,932,047 A | 6/1990 | Emmons et al. |
| 4,939,728 A | 7/1990 | Markkula, Jr. et al. |
| 4,945,404 A | 7/1990 | Miller |
| 4,947,483 A | 8/1990 | Dirr |
| 4,949,187 A | 8/1990 | Cohen |
| 4,953,160 A | 8/1990 | Gupta |
| 4,954,886 A | 9/1990 | Elberbaum |
| 4,955,048 A | 9/1990 | Iwamura et al. |
| 4,969,136 A | 11/1990 | Chamberlin et al. |
| 4,969,147 A | 11/1990 | Markkula, Jr. et al. |
| 4,973,954 A | 11/1990 | Schwarz |
| 4,975,896 A | 12/1990 | D'Agosto, III et al. |
| 4,975,906 A | 12/1990 | Takiyasu et al. |
| 4,979,028 A | 12/1990 | Minematsu et al. |
| 4,985,892 A | 1/1991 | Camarata |
| 4,989,081 A | 1/1991 | Miyagawa et al. |
| 4,996,709 A | 2/1991 | Heep et al. |
| 5,010,399 A | 4/1991 | Goodman et al. |
| 5,014,308 A | 5/1991 | Fox |
| 5,018,138 A | 5/1991 | Twitty et al. |
| 5,022,069 A | 6/1991 | Chen |
| 5,023,868 A | 6/1991 | Davidson et al. |
| 5,027,426 A | 6/1991 | Chiocca, Jr. |
| 5,032,819 A | 7/1991 | Sakuragi et al. |
| 5,033,062 A | 7/1991 | Morrow et al. |
| 5,034,883 A | 7/1991 | Donaldson et al. |
| 5,036,513 A | 7/1991 | Greenblatt |
| 5,051,822 A | 9/1991 | Rhoades |
| 5,065,133 A | 11/1991 | Howard |
| 5,070,522 A | 12/1991 | Nilssen |
| 5,089,886 A | 2/1992 | Grandmougin |
| 5,090,052 A | 2/1992 | Nakajima et al. |
| 5,095,497 A | 3/1992 | Aman et al. |
| 5,113,498 A | 5/1992 | Evan et al. |
| 5,125,077 A | 6/1992 | Hall |
| 5,144,544 A | 9/1992 | Jenneve et al. |
| 5,148,144 A | 9/1992 | Sutterlin et al. |
| 5,157,711 A | 10/1992 | Shimanuki |
| 5,175,764 A | 12/1992 | Patel et al. |
| 5,181,240 A | 1/1993 | Sakuragi et al. |
| 5,210,788 A | 5/1993 | Nilssen |
| 5,216,704 A | 6/1993 | Williams et al. |
| 5,220,597 A | 6/1993 | Horiuchi |
| 5,224,154 A | 6/1993 | Aldridge et al. |
| 5,247,347 A | 9/1993 | Litteral et al. |
| 5,255,267 A | 10/1993 | Hansen et al. |
| 5,257,006 A | 10/1993 | Graham et al. |
| 5,283,637 A | 2/1994 | Goolcharan |
| 5,289,359 A | 2/1994 | Ziermann |
| 5,319,634 A | 6/1994 | Bartholomew et al. |
| 5,323,461 A | 6/1994 | Rosenbaum et al. |
| 5,341,415 A | 8/1994 | Baran |
| 5,343,514 A | 8/1994 | Snyder |
| 5,347,549 A | 9/1994 | Baumann |
| 5,351,272 A | 9/1994 | Abraham |
| 5,353,334 A | 10/1994 | O'Sullivan |
| 5,363,432 A | 11/1994 | Martin et al. |
| 5,379,005 A | 1/1995 | Aden et al. |
| 5,391,932 A | 2/1995 | Small et al. |
| 5,406,260 A | 4/1995 | Cummings et al. |
| 5,408,260 A | 4/1995 | Arnon |
| 5,410,343 A | 4/1995 | Coddington et al. |
| 5,420,578 A | 5/1995 | O'Brien et al. |
| 5,420,886 A | 5/1995 | Ohmori |
| 5,424,710 A | 6/1995 | Baumann |
| 5,428,682 A | 6/1995 | Apfel |
| 5,440,335 A | 8/1995 | Beveridge |
| 5,448,635 A | 9/1995 | Biehl et al. |
| 5,452,289 A | 9/1995 | Sharma et al. |
| 5,454,008 A | 9/1995 | Baumann et al. |
| 5,461,671 A | 10/1995 | Sakuragi et al. |
| 5,463,616 A | 10/1995 | Kruse et al. |
| 5,475,687 A | 12/1995 | Markkula, Jr. et al. |
| 5,483,574 A | 1/1996 | Yuyama |
| 5,530,737 A | 6/1996 | Bartholomew et al. |
| 5,530,748 A | 6/1996 | Ohmori |
| 5,533,101 A | 7/1996 | Miyagawa |
| 5,539,805 A | 7/1996 | Bushue et al. |
| 5,544,243 A | 8/1996 | Papadopoulos |
| 5,546,385 A | 8/1996 | Caspi et al. |
| 5,548,592 A | 8/1996 | Komarek et al. |
| 5,548,614 A | 8/1996 | Stoll et al. |
| 5,550,836 A | 8/1996 | Albrecht et al. |
| 5,553,063 A | 9/1996 | Dickson |
| 5,553,138 A | 9/1996 | Heald et al. |
| 5,566,233 A | 10/1996 | Liu |
| 5,568,547 A | 10/1996 | Nishimura |
| 5,570,085 A | 10/1996 | Bertsch |
| 5,574,748 A | 11/1996 | Vander Mey et al. |
| 5,581,555 A | 12/1996 | Dubberly et al. |
| 5,583,934 A | 12/1996 | Zhou |
| 5,587,692 A | 12/1996 | Graham et al. |
| 5,592,540 A | 1/1997 | Beveridge |
| 5,596,631 A | 1/1997 | Chen |
| 5,599,206 A | 2/1997 | Slack et al. |
| 5,604,737 A | 2/1997 | Iwami et al. |
| 5,604,791 A | 2/1997 | Lee |
| 5,608,792 A | 3/1997 | Laidler |
| 5,610,916 A | 3/1997 | Kostreski et al. |
| 5,619,252 A | 4/1997 | Nakano |
| 5,621,455 A | 4/1997 | Rogers et al. |
| 5,623,537 A | 4/1997 | Ensor et al. |
| 5,625,863 A | 4/1997 | Abraham |
| 5,627,827 A | 5/1997 | Dale et al. |
| 5,646,983 A | 7/1997 | Suffern et al. |
| 5,651,696 A | 7/1997 | Jennison |
| 5,659,608 A | 8/1997 | Stiefel |
| 5,675,375 A | 10/1997 | Riffee |
| 5,682,423 A | 10/1997 | Walker |
| 5,684,826 A | 11/1997 | Ratner |
| 5,696,790 A | 12/1997 | Graham et al. |
| 5,705,974 A | 1/1998 | Patel et al. |
| 5,706,007 A | 1/1998 | Fragnito et al. |
| 5,706,157 A | 1/1998 | Galecki et al. |
| 5,708,701 A | 1/1998 | Houvig et al. |
| 5,729,824 A | 3/1998 | O'Neill et al. |
| 5,742,527 A | 4/1998 | Rybicki et al. |
| 5,742,596 A | 4/1998 | Baratz et al. |
| 5,748,634 A | 5/1998 | Sokol et al. |
| 5,757,803 A | 5/1998 | Russell et al. |
| 5,757,936 A | 5/1998 | Lee |
| 5,764,743 A | 6/1998 | Goedken et al. |
| 5,774,526 A | 6/1998 | Propp et al. |
| 5,778,303 A | 7/1998 | Shinozaki et al. |
| 5,787,115 A | 7/1998 | Turnbull et al. |
| 5,799,069 A | 8/1998 | Weston et al. |
| 5,802,283 A | 9/1998 | Grady et al. |
| 5,805,053 A | 9/1998 | Patel et al. |
| 5,805,591 A | 9/1998 | Naboulsi et al. |
| 5,812,786 A | 9/1998 | Seazholtz et al. |
| 5,815,681 A | 9/1998 | Kikinis |
| 5,818,710 A | 10/1998 | LeVan Suu |
| 5,818,821 A | 10/1998 | Schurig |
| 5,822,678 A | 10/1998 | Evanyk |
| 5,826,196 A | 10/1998 | Cuthrell |
| 5,835,005 A | 11/1998 | Furukawa et al. |
| 5,838,777 A | 11/1998 | Chang et al. |
| 5,841,360 A | 11/1998 | Binder |
| 5,841,840 A | 11/1998 | Smith et al. |

**US 7,522,714 B2**

Page 4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5,841,841 | A | 11/1998 | Dodds et al. | 6,202,211 | B1 | 3/2001 | Williams, Jr. |
| 5,842,032 | A | 11/1998 | Bertsch | 6,208,637 | B1 | 3/2001 | Eames |
| 5,842,111 | A | 11/1998 | Byers | 6,212,227 | B1 | 4/2001 | Ko et al. |
| 5,844,888 | A | 12/1998 | Markkula et al. | 6,212,274 | B1 | 4/2001 | Ninh |
| 5,848,150 | A | 12/1998 | Bingel | 6,215,789 | B1 | 4/2001 | Keenan et al. |
| D404,721 | S | 1/1999 | Messer | 6,216,160 | B1 | 4/2001 | Dichter |
| D405,422 | S | 2/1999 | Law et al. | 6,218,930 | B1 | 4/2001 | Katzenberg et al. |
| 5,878,047 | A | 3/1999 | Ganek et al. | 6,227,499 | B1 | 5/2001 | Jennison et al. |
| 5,878,133 | A | 3/1999 | Zhou et al. | 6,236,653 | B1 | 5/2001 | Dalton et al. |
| 5,884,086 | A | 3/1999 | Amoni et al. | 6,236,664 | B1 | 5/2001 | Erreygers |
| 5,889,856 | A | 3/1999 | O'Toole et al. | 6,240,166 | B1 | 5/2001 | Collin et al. |
| 5,892,764 | A | 4/1999 | Riemann et al. | 6,243,571 | B1 | 6/2001 | Bullock et al. |
| 5,892,792 | A | 4/1999 | Walley | 6,246,748 | B1 | 6/2001 | Yano |
| 5,896,443 | A | 4/1999 | Dichter | 6,252,957 | B1 | 6/2001 | Jauregui et al. |
| 5,896,556 | A | 4/1999 | Moreland et al. | 6,256,518 | B1 | 7/2001 | Buhrmann |
| 5,903,213 | A | 5/1999 | Hodge et al. | 6,259,775 | B1 | 7/2001 | Alpert et al. |
| 5,903,643 | A | 5/1999 | Bruhnke | 6,282,238 | B1 | 8/2001 | Landry |
| 5,905,786 | A | 5/1999 | Hoopes | 6,282,277 | B1 | 8/2001 | DeBalko |
| 5,911,119 | A | 6/1999 | Bartholomew et al. | 6,285,754 | B1 | 9/2001 | Sun et al. |
| 5,912,895 | A | 6/1999 | Terry et al. | 6,292,467 | B1 | 9/2001 | Keller |
| 5,930,340 | A | * 7/1999 | Bell ........................ 379/93.08 | 6,292,517 | B1 | 9/2001 | Jeffress et al. |
| 5,937,055 | A | 8/1999 | Kaplan | 6,295,356 | B1 | 9/2001 | De Nicolo |
| 5,938,757 | A | 8/1999 | Bertsch | 6,310,894 | B1 | 10/2001 | Counterman |
| 5,940,400 | A | 8/1999 | Eastmond et al. | 6,317,884 | B1 | 11/2001 | Eames et al. |
| 5,940,479 | A | 8/1999 | Guy et al. | 6,320,866 | B2 | 11/2001 | Wolf et al. |
| 5,943,404 | A | 8/1999 | Sansom et al. | 6,320,900 | B1 | 11/2001 | Liu |
| 5,949,476 | A | 9/1999 | Pocock et al. | 6,324,268 | B1 | 11/2001 | Balachandran et al. |
| 5,960,066 | A | * 9/1999 | Hartmann et al. ........ 379/93.08 | 6,349,133 | B1 | 2/2002 | Matthews et al. |
| 5,963,539 | A | 10/1999 | Webber, Jr. et al. | 6,356,562 | B1 | 3/2002 | Bamba |
| 5,963,595 | A | 10/1999 | Graham et al. | 6,370,149 | B1 | 4/2002 | Gorman et al. |
| 5,970,127 | A | 10/1999 | Smith et al. | 6,389,125 | B1 | 5/2002 | Ubowski |
| 5,982,784 | A | 11/1999 | Bell | 6,393,050 | B1 | 5/2002 | Liu |
| 5,982,854 | A | 11/1999 | Ehreth | 6,396,391 | B1 | 5/2002 | Binder |
| 5,994,998 | A | 11/1999 | Fisher et al. | 6,396,393 | B2 | 5/2002 | Yuasa |
| 5,995,598 | A | 11/1999 | Berstis | 6,404,773 | B1 | 6/2002 | Williams et al. |
| 6,002,722 | A | 12/1999 | Wu | 6,414,952 | B2 | 7/2002 | Foley |
| 6,005,873 | A | 12/1999 | Amit | 6,424,661 | B1 | 7/2002 | Bentley |
| 6,011,794 | A | 1/2000 | Mordowitz et al. | 6,427,237 | B1 | 7/2002 | Aranguren et al. |
| 6,026,150 | A | 2/2000 | Frank et al. | 6,430,199 | B1 | 8/2002 | Kerpez |
| 6,029,047 | A | 2/2000 | Ishida et al. | 6,433,672 | B1 | 8/2002 | Shirmard |
| 6,038,425 | A | 3/2000 | Jeffrey | 6,434,123 | B1 | 8/2002 | Park |
| 6,047,055 | A | 4/2000 | Carkner et al. | 6,449,318 | B1 | 9/2002 | Rumbaugh |
| 6,052,380 | A | 4/2000 | Bell | 6,449,348 | B1 | 9/2002 | Lamb et al. |
| 6,055,435 | A | 4/2000 | Smith et al. | 6,470,053 | B1 | 10/2002 | Liu |
| 6,061,357 | A | 5/2000 | Olshansky et al. | 6,473,495 | B1 | 10/2002 | Willer |
| 6,061,392 | A | 5/2000 | Bremer et al. | 6,473,608 | B1 | 10/2002 | Lehr et al. |
| 6,069,899 | A | 5/2000 | Foley | 6,480,510 | B1 | 11/2002 | Binder |
| 6,087,860 | A | 7/2000 | Liu et al. | 6,483,902 | B1 | 11/2002 | Stewart et al. |
| 6,088,368 | A | 7/2000 | Rubinstain et al. | 6,493,325 | B1 | 12/2002 | Hjalmtysson et al. |
| 6,094,441 | A | 7/2000 | Jung et al. | 6,493,875 | B1 | 12/2002 | Eames et al. |
| 6,097,801 | A | 8/2000 | Williams et al. | 6,507,647 | B1 | 1/2003 | Mandalia |
| 6,101,341 | A | 8/2000 | Manabe | 6,510,204 | B2 | 1/2003 | De Clercq et al. |
| 6,107,912 | A | 8/2000 | Bullock et al. | 6,522,662 | B1 | 2/2003 | Liu |
| 6,108,330 | A | 8/2000 | Bhatia et al. | 6,522,728 | B1 | * 2/2003 | Willer ..................... 379/90.01 |
| 6,111,764 | A | 8/2000 | Atou et al. | 6,522,730 | B1 | 2/2003 | Timm et al. |
| 6,115,468 | A | 9/2000 | De Nicolo | 6,522,731 | B2 | 2/2003 | Matsumoto |
| 6,115,755 | A | 9/2000 | Krishan | 6,526,581 | B1 | 2/2003 | Edson |
| 6,128,471 | A | 10/2000 | Quelch et al. | 6,532,279 | B1 | 3/2003 | Goodman |
| 6,130,893 | A | 10/2000 | Whittaker et al. | 6,532,280 | B1 | 3/2003 | McDonald |
| 6,130,896 | A | 10/2000 | Lueker et al. | 6,535,587 | B1 | 3/2003 | Kobayashi |
| 6,134,235 | A | 10/2000 | Goldman et al. | 6,539,011 | B1 | 3/2003 | Keenan et al. |
| 6,134,308 | A | 10/2000 | Fallon et al. | 6,549,616 | B1 | * 4/2003 | Binder ..................... 379/90.01 |
| 6,137,865 | A | * 10/2000 | Ripy et al. ............... 379/93.05 | 6,556,564 | B2 | 4/2003 | Rogers |
| 6,141,356 | A | 10/2000 | Gorman | 6,556,581 | B1 | 4/2003 | He et al. |
| 6,144,399 | A | 11/2000 | Manchester et al. | 6,560,319 | B1 | 5/2003 | Binder |
| 6,151,480 | A | 11/2000 | Fischer et al. | 6,560,333 | B1 | 5/2003 | Consiglio et al. |
| 6,154,465 | A | 11/2000 | Pickett | 6,563,816 | B1 | 5/2003 | Nodoushani et al. |
| 6,157,716 | A | 12/2000 | Ortel | 6,567,981 | B1 | 5/2003 | Jeffrey |
| 6,160,880 | A | 12/2000 | Allen | 6,570,869 | B1 | 5/2003 | Shankar et al. |
| 6,167,043 | A | 12/2000 | Frantz | 6,570,890 | B1 | 5/2003 | Keenan et al. |
| 6,169,795 | B1 | 1/2001 | Dunn et al. | 6,572,384 | B1 | 6/2003 | Marchevsky |
| 6,175,860 | B1 | 1/2001 | Gaucher | 6,574,242 | B1 | 6/2003 | Keenan et al. |
| 6,192,399 | B1 | 2/2001 | Goodman | 6,574,313 | B1 | 6/2003 | Chea, Jr. et al. |

US 7,522,714 B2
Page 5

| | | | |
|---|---|---|---|
| 6,577,631 B1 | 6/2003 | Keenan et al. | |
| 6,577,882 B1 | 6/2003 | Roos | |
| 6,580,254 B2 | 6/2003 | Schofield | |
| 6,580,710 B1 | 6/2003 | Bowen et al. | |
| 6,580,785 B2 | 6/2003 | Bremer et al. | |
| 6,584,122 B1 | 6/2003 | Matthews et al. | |
| 6,584,148 B1 | 6/2003 | Zitting et al. | |
| 6,584,197 B1 | 6/2003 | Boudreaux, Jr. et al. | |
| 6,587,454 B1 | 7/2003 | Lamb | |
| 6,587,473 B2 | 7/2003 | Terry et al. | |
| 6,587,479 B1 | 7/2003 | Bianchi et al. | |
| 6,587,560 B1 | 7/2003 | Scott et al. | |
| 6,603,808 B1 | 8/2003 | Anne et al. | |
| 6,640,308 B1 | 10/2003 | Keyghobad et al. | |
| 6,643,566 B1 | 11/2003 | Lehr et al. | |
| 6,650,622 B1 | 11/2003 | Austerman, III et al. | |
| 6,653,932 B1 | 11/2003 | Walley et al. | |
| 6,657,994 B1 | 12/2003 | Rajakarunanayake | |
| 6,658,098 B1 | 12/2003 | Lamb et al. | |
| 6,658,108 B1 | 12/2003 | Bissell et al. | |
| 6,665,404 B2 | 12/2003 | Cohen | |
| 6,678,321 B1 | 1/2004 | Graham et al. | |
| 6,678,721 B1 | 1/2004 | Bell | |
| 6,681,013 B1 | 1/2004 | Miyamoto | |
| 6,686,832 B2 | 2/2004 | Abraham | |
| 6,690,677 B1 * | 2/2004 | Binder ................... 379/90.01 | |
| 6,690,792 B1 | 2/2004 | Robinson et al. | |
| 6,693,916 B1 | 2/2004 | Chaplik et al. | |
| 6,697,358 B2 | 2/2004 | Bernstein | |
| 6,700,970 B1 | 3/2004 | Aronson et al. | |
| 6,701,406 B1 | 3/2004 | Chang et al. | |
| 6,704,414 B2 | 3/2004 | Murakoshi | |
| 6,710,704 B2 | 3/2004 | Fisher et al. | |
| 6,711,138 B1 | 3/2004 | Pai et al. | |
| 6,721,365 B1 | 4/2004 | Yin et al. | |
| 6,721,419 B1 | 4/2004 | Stell et al. | |
| 6,721,790 B1 | 4/2004 | Chen | |
| 6,731,627 B1 | 5/2004 | Gupta et al. | |
| 6,732,315 B2 | 5/2004 | Yagil et al. | |
| 6,732,368 B1 | 5/2004 | Michael et al. | |
| 6,735,217 B1 | 5/2004 | Webber, Jr. et al. | |
| 6,738,382 B1 | 5/2004 | West et al. | |
| 6,738,470 B1 | 5/2004 | Aronovitz | |
| 6,738,597 B1 | 5/2004 | Jeung et al. | |
| 6,744,883 B1 * | 6/2004 | Bingel et al. ............. 379/93.05 | |
| 6,747,995 B1 | 6/2004 | Brown et al. | |
| 6,748,078 B1 | 6/2004 | Posthuma | |
| 6,754,186 B1 | 6/2004 | Bullman | |
| 6,759,946 B2 | 7/2004 | Sahinoglu et al. | |
| 6,763,097 B1 | 7/2004 | Vitenberg | |
| 6,763,109 B1 | 7/2004 | Hoskins | |
| 6,771,750 B1 | 8/2004 | Nayler et al. | |
| 6,771,773 B1 | 8/2004 | Hanrieder et al. | |
| 6,771,774 B1 | 8/2004 | Phan et al. | |
| 6,773,632 B1 | 8/2004 | Marshall et al. | |
| 6,775,299 B1 | 8/2004 | Olson et al. | |
| 6,778,549 B1 | 8/2004 | Keller | |
| 6,778,646 B1 | 8/2004 | Sun | |
| 6,778,817 B1 | 8/2004 | Bullock et al. | |
| 6,785,296 B1 | 8/2004 | Bell | |
| 6,788,782 B1 | 9/2004 | Fotsch et al. | |
| 6,792,323 B2 | 9/2004 | Krzyzanowski et al. | |
| 6,795,539 B2 | 9/2004 | Culli et al. | |
| 6,798,767 B1 | 9/2004 | Alexande et al. | |
| 6,815,844 B2 | 11/2004 | Kovarik | |
| 6,819,760 B1 | 11/2004 | Nayler | |
| 6,823,047 B1 | 11/2004 | Cruickshank | |
| 6,831,975 B1 | 12/2004 | Faswaran et al. | |
| 6,831,976 B1 | 12/2004 | Comerford et al. | |
| 6,834,057 B1 | 12/2004 | Rabenko et al. | |
| 6,836,546 B1 | 12/2004 | Willer | |
| 6,839,345 B2 | 1/2005 | Lu et al. | |
| 6,842,459 B1 | 1/2005 | Binder | |
| 6,847,718 B1 | 1/2005 | Hiraoka | |
| 6,856,799 B1 | 2/2005 | Ritter | |
| 6,862,353 B2 | 3/2005 | Rabenko et al. | |
| 6,865,193 B2 | 3/2005 | Terk | |
| 6,868,072 B1 | 3/2005 | Lin et al. | |
| 6,868,081 B1 | 3/2005 | Akram et al. | |
| 6,876,648 B1 | 4/2005 | Lee | |
| 6,882,714 B2 | 4/2005 | Mansfield | |
| 6,898,413 B2 | 5/2005 | Yip et al. | |
| 6,904,134 B2 | 6/2005 | Jeon et al. | |
| 6,909,725 B1 | 6/2005 | Chow | |
| 6,912,209 B1 | 6/2005 | Thi et al. | |
| 6,917,681 B2 | 7/2005 | Robinson et al. | |
| 6,922,407 B2 | 7/2005 | Wu | |
| 6,925,089 B2 | 8/2005 | Chow et al. | |
| 6,934,754 B2 | 8/2005 | West et al. | |
| 6,937,056 B2 | 8/2005 | Binder | |
| 6,941,364 B2 | 9/2005 | Kim et al. | |
| 6,947,736 B2 | 9/2005 | Shaver et al. | |
| 6,956,826 B1 | 10/2005 | Binder | |
| 6,961,303 B1 | 11/2005 | Binder | |
| 6,963,559 B2 | 11/2005 | Elo | |
| 6,970,538 B2 * | 11/2005 | Binder .................... 379/90.01 | |
| 6,973,394 B2 | 12/2005 | Jaeger et al. | |
| 6,975,713 B1 | 12/2005 | Smith et al. | |
| 6,980,638 B1 | 12/2005 | Smith et al. | |
| 6,985,714 B2 | 1/2006 | Akiyama et al. | |
| 6,989,733 B2 | 1/2006 | Simonsen et al. | |
| 6,996,213 B1 | 2/2006 | De Jong | |
| 6,996,729 B2 | 2/2006 | Volkening et al. | |
| 6,998,964 B2 | 2/2006 | Lomax, Jr. et al. | |
| 7,002,898 B1 | 2/2006 | Lou | |
| 7,003,102 B2 | 2/2006 | Kiko | |
| 7,006,523 B2 | 2/2006 | Binder | |
| 7,009,946 B1 | 3/2006 | Kardach | |
| 7,016,377 B1 | 3/2006 | Chun et al. | |
| 7,027,566 B2 | 4/2006 | Bossemeyer, Jr. et al. | |
| 7,035,270 B2 | 4/2006 | Moore, Jr. et al. | |
| 7,053,501 B1 | 5/2006 | Barrass | |
| 7,054,303 B2 | 5/2006 | Miyazaki et al. | |
| 7,058,174 B2 | 6/2006 | Posthuma | |
| 7,068,668 B2 | 6/2006 | Feuer | |
| 7,079,647 B2 | 7/2006 | Tomobe | |
| 7,082,141 B2 | 7/2006 | Sharma et al. | |
| 7,095,848 B1 | 8/2006 | Fischer et al. | |
| 7,095,849 B2 | 8/2006 | Smith et al. | |
| 7,099,368 B2 | 8/2006 | Santhoff et al. | |
| 7,099,707 B2 | 8/2006 | Amin et al. | |
| 7,106,721 B1 | 9/2006 | Binder | |
| 7,113,574 B1 | 9/2006 | Haas et al. | |
| 7,142,560 B2 | 11/2006 | Mansfield | |
| 7,142,563 B1 | 11/2006 | Lin | |
| 7,142,934 B2 | 11/2006 | Janik | |
| 7,149,182 B1 | 12/2006 | Renucci et al. | |
| 7,149,474 B1 | 12/2006 | Mikhak | |
| 7,154,996 B2 | 12/2006 | Strauss | |
| 7,162,013 B2 | 1/2007 | Gavette et al. | |
| 7,171,506 B2 | 1/2007 | Iwamura | |
| 7,199,706 B2 | 4/2007 | Dawson et al. | |
| 7,206,322 B1 | 4/2007 | Garg et al. | |
| 7,206,417 B2 | 4/2007 | Nathan | |
| 7,209,719 B2 | 4/2007 | Liebenow | |
| 2001/0030950 A1 | 10/2001 | Chen et al. | |
| 2002/0006137 A1 | 1/2002 | Rabenko et al. | |
| 2002/0015489 A1 | 2/2002 | Ben-David | |
| 2002/0037004 A1 | 3/2002 | Bossemeyer et al. | |
| 2002/0057581 A1 | 5/2002 | Nadav | |
| 2002/0061012 A1 | 5/2002 | Thi et al. | |
| 2002/0076038 A1 | 6/2002 | Barrese et al. | |
| 2002/0110236 A1 | 8/2002 | Karnad | |
| 2002/0128009 A1 | 9/2002 | Boch et al. | |
| 2002/0144159 A1 | 10/2002 | Wu et al. | |
| 2002/0176567 A1 | 11/2002 | Chen et al. | |

**US 7,522,714 B2**

Page 6

| | | | |
|---|---|---|---|
| 2002/0180592 | A1 | 12/2002 | Gromov |
| 2002/0198952 | A1 | 12/2002 | Bell |
| 2003/0016794 | A1 | 1/2003 | Brothers |
| 2003/0058085 | A1 | 3/2003 | Fisher et al. |
| 2003/0061522 | A1 | 3/2003 | Ke et al. |
| 2003/0067910 | A1 | 4/2003 | Razazian et al. |
| 2003/0088706 | A1 | 5/2003 | Chan et al. |
| 2003/0099076 | A1 | 5/2003 | Elkayam et al. |
| 2003/0107269 | A1 | 6/2003 | Jetzt |
| 2003/0112965 | A1 | 6/2003 | McNamera et al. |
| 2003/0146765 | A1 | 8/2003 | Darshan et al. |
| 2003/0179869 | A1 * | 9/2003 | Yoshitani ................. 379/93.07 |
| 2003/0194912 | A1 | 10/2003 | Ferentz |
| 2003/0204393 | A1 | 10/2003 | Czerwiec et al. |
| 2003/0206623 | A1 | 11/2003 | Deichstetter et al. |
| 2003/0207697 | A1 | 11/2003 | Shpak |
| 2004/0006484 | A1 | 1/2004 | Manis et al. |
| 2004/0037317 | A1 | 2/2004 | Zalitzky et al. |
| 2004/0083262 | A1 | 4/2004 | Trantow |
| 2004/0090984 | A1 | 5/2004 | Saint-Hilaire et al. |
| 2004/0107299 | A1 | 6/2004 | Lee et al. |
| 2004/0136373 | A1 | 7/2004 | Bareis |
| 2004/0170262 | A1 | 9/2004 | Ohno |
| 2004/0177167 | A1 | 9/2004 | Iwamura et al. |
| 2004/0180573 | A1 | 9/2004 | Chen |
| 2004/0204040 | A1 | 10/2004 | Heijnen |
| 2004/0268160 | A1 | 12/2004 | Atkinson et al. |
| 2005/0015805 | A1 | 1/2005 | Iwamura |
| 2005/0038875 | A1 | 2/2005 | Park |
| 2005/0063403 | A1 | 3/2005 | Binder |
| 2005/0076149 | A1 | 4/2005 | McKown et al. |
| 2005/0083959 | A1 | 4/2005 | Binder |
| 2005/0086694 | A1 | 4/2005 | Hicks et al. |
| 2005/0114325 | A1 | 5/2005 | Liu et al. |
| 2005/0150100 | A1 | 7/2005 | Merdan et al. |
| 2005/0226200 | A1 | 10/2005 | Askildsen et al. |
| 2006/0056444 | A1 | 3/2006 | Binder |
| 2006/0140178 | A1 | 6/2006 | Cheng et al. |
| 2006/0153169 | A1 | 7/2006 | Koifman et al. |
| 2006/0193310 | A1 | 8/2006 | Landry et al. |
| 2006/0193313 | A1 | 8/2006 | Landry et al. |
| 2006/0203981 | A1 | 9/2006 | Binder |
| 2006/0215680 | A1 | 9/2006 | Camagna |
| 2006/0238250 | A1 | 10/2006 | Camagna et al. |
| 2006/0251094 | A1 | 11/2006 | Van Vleck et al. |
| 2006/0251159 | A1 | 11/2006 | Huotari et al. |
| 2006/0251179 | A1 | 11/2006 | Ghoshal |
| 2006/0280197 | A1 | 12/2006 | Stone |
| 2006/0291493 | A1 | 12/2006 | Schley-May et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 96/23377 | 8/1996 |
| WO | WO 98/02985 | 1/1998 |
| WO | WO 99/03255 | 1/1999 |
| WO | WO 99/12330 | 3/1999 |
| WO | WO 01028215 | 4/2001 |

OTHER PUBLICATIONS

Olshansky, "A Full Service Network for the Copper Plant", Telephony, 1985, pp. 52-60.
Instant Network Rules on Phone Lines, Electronic Design, 1987.
O. Agazzi, et al., Large Scale Integration of Hybrid-Method Digital Subscriber Loops, IEEE Transactions on Communications, vol. COM-30, No. 9, Sep. 1982, pp. 2095-2108.
S.V. Ahamed, et al., "A tutorial on Two-Wire Digital Transmission in the Loop Plant", IEEE Transactions on Communications, vol. COM-29, No. 11, Nov. 1991, pp. 1554-1564.
J. Alves, "Data Over Voice—A Low Cost LAN Alternative", Communications Show and Conference, MECOM 87, Jan., pp. 13-15.
S.B. Andrews, "The Generic Digital Channel Concept", IEEE International Conference on Communications, 1985, Jun. 23-26, 1985, Chicago, IL, pp. 7.1.1-7.1.3.

G.W. Beene, "Design Considerations for a CO-Powered Distributed-Drop PCM Station Carrier", IEEE Transactions on Communications, vol. COM-30, No. 9, Sep. 1982, pp. 2022-2028.
A. Bienz, "1+1=1—Order Das Telefonnetz Als Datennetz", Sysdata, vol. 16, Aug. 28, 1985, pp. 41-42.
A. Brosio, et al., "A Comparison of Digital Subscriber Line Transmission Systems Employing Different Line Codes", IEEE Transactions on Communications, vol. COM-29, No. 11, Nov. 1981, pp. 1581-1588.
T.P. Byrne, et al., "Positioning the Subscriber Loop Network for Digital Services", IEEE Transactions on Communications, vol. COM-30, No. 9, Sep. 1982, pp. 2006-2011.
R.G. Cornell, et al., "Progress Towards Digital Subscriber Line Services and Signaling", IEEE Transactions on Communications, vol. COM-29, No. 11, Nov. 1981, pp. 1589-1594.
S. Davis, "Integrating Voice and Data: A Marriage of Convenience", Today's Office, vol. 24, No. 9, Feb. 1990, pp. 28-30.
M. Devault, et al., "Resaux Domestiques et Terminaux Audiovisuels Numeriques", L'Echo Des Recherches, No. 126, 1986, pp. 37-46.
H. Fuchs, et al., "Providing Full Duplex Transmission Over Two-Wire Subscriber Loops", Telephony, vol. 208, No. 11, Mar. 18, 1985, pp. 76, 77, 78 and 84.
H. Fukagawa, et al., "Bus Wiring System for Residences", Matsushita Electric Works Technical Report, No. 36, Feb. 1988, pp. 31-35.
D. Glick, et al., "Providing Telco Customers Continuous Data Services", Telephony, vol. 205, No. 22, Nov. 1983, pp. 46, 50, 51, 54.
J.B. Hughes, et al., "A Receiver IC for a 1+1 Digital Subscriber Loop", IEEE Journal of Solid State Circuitry, vol. S.C. 20, No. 3, Jun. 1985 pp. 671-678.
R. Jelski, "Subscriber Subscriber System—A New Life", Communications International, vol. 4, No. 5, May 1977, pp. 29-30.
A.J. Karia, et al., "A Digital Subscriber Carrier System for the Evolving Subscriber Loop Network", IEEE Transactions on Communications, vol. COM-30, No. 9, Sep. 1982, pp. 2012, 2014, 2015.
T. Masuda, et al., "2-Wire Video Intercom System with Telephone", National Technical Report, vol. 37, No. 6, Dec. 1991, pp. 74-80.
T. Matthews, "Telecomm System is Nerve Center", Infosystems, vol. 31, No. 5, May 1984, pp. 68-69.
J. K. Merrow, "A New Approach to Integrating Local Area Data and Voice Transmission," Telephony, vol. 250, No. 17, Oct. 1983, 2 pages.
H. Morgan, "Two-Wire Full-Duplex Modem Simplifies Voice and Data Networking", Mini-Micro Systems, vol. 17, No. 3, Mar. 1984, 4 pages.
R. Murakoshi, "Home Automation", Journal of the Society of Instrument and Control Engineers, vol. 23, No. 11, Nov. 1984, pp. 955-958.
R.D. Nash, et al., "Simultaneous Transmission of Speech and Data Over An Analog Telephone Channel", GLOBECOM '85. IEEE Global Telecommunications Conference. Conference Record. Communication Technology to Provide New Services, Dec. 25, 1985, New Orleans, Louisiana, pp. 4.2.1-4.2.4.
H. Ogiwara, et al., Design Philosophy and Hardware Implementation for Digital Subscriber Loops, IEEE Transactions on Communications, vol. COM-30, No. 9, Sep. 1982, pp. 2057-2065.
J.L. Pernin, "Related Evolution of Subscriber Loop Plant and Residential Data Transmission Needs", Intelcon 79 Exposition Proceedings, Feb. 26-Mar. 2, 1979, Dallas, Texas, pp. 596-599.
R.A. Tatum, "Project Victoria—the 7-in-1 Solution", Telephone Engineer and Management, vol. 90, No. 1, Jan. 1, 1986, pp. 47 and 50.
A. Teshima, et al., "Still Voice Telecommunication Over the Analog Telephone Network", Journal of the Institute of Television Engineers of Japan, vol. 42, No. 11, Nov. 1988, pp. 1162-1167.
S.R. Treves, et al., "Text, Image and Data Integration in a Distributed Control Digital Voice Switching System", International Switching Symposium—ISS '81 CIC, Sep. 21-25, 1981, Montreal, Quebec, Canada, pp. 1-7.
T. Tsuda, et al., "Experimental In-House Multiservice Communication System", Fujitsu Scientific and Technical Journal, vol. 16, No. 3, Sep. 1980, pp. 29-45.
K. Urui, "Integrated Voice/Data Digital EPBX", Toshiba Review, No. 150, Winter 1984, pp. 30-33.

**US 7,522,714 B2**

Page 7

A.F. Van Den Berg, et al., "Principles van de Modem: Technieken en Specificaties", Elektronica, vol. 32, No. 5, Mar. 9, 1984, pp. 11, 13, 15, 17, 19 and 21.

M.G. Vry, et al., "Digital 1+1 Systems for Local Network Enhancement", Conference on Communications Equipment and Systems, Apr. 20-22, 1982, Birmingham, United Kingdom, pp. 61-64.

M.G. Vry, et al., "The Design of a 1+1 System for Digital Signal Transmission to the Subscriber", NTG-Bachberichte, vol. 73, 1980, pp. 36-40.

J.A. Webb, "A New Concept in Data-Above-Voice (DAV)", PTC '86: Evolutions of the Digital Pacific. Telecommunications—Asia, Americas, Pacific: PTC '86 Proceedings, Jan. 12-15, 1986, Honolulu, Hawaii, pp. 260-265.

K. Yamamoto, "A Home Terminal System Using the Home Area Information Network", IEEE Transactions on Consumer Electronics, vol. CE-30, No. 4, Nov. 1984, pp. 608-616.

"Centrex LAN Can Provide Advanced Network Capabilities Over the Existing Telephone Wires", Communications News, vol. 25, No. 6, Jun. 1988, p. 27.

"Data Over Voice is Solution for Corporate Network", Telephone Engineer and Management, vol. 91, No. 9, May 1, 1987, pp. 67-69.

"Data Carrier System Allows Simultaneous Voice/Data Transmission for PABX Telephone Systems", Computer Design, vol. 21, No. 5, May 1982, pp. 68 and 70.

"Computerized Telephone System Integrates Voice and Data Switching", Computer Design, vol. 20, No. 4, Apr. 1981, 6 pages.

"AT&T's Systemax Premises Distribution System Solves Networking Problems", Fiber Optics Magazine, vol. 12, No. 4, Jul.-Aug. 1990, pp. 14-16.

M.M. Anderson, "Video Services on Copper", Conference: ICC 91, International Conference on Communications Conference Record, Jun. 2-26, 1991, Denver, CO, pp. 302-306.

M. Bastian, "Voice-Data Integration: An Architecture Perspective," IEEE Communications Magazine, vol. 24, No. 7, Jul. 1986, pp. 8-12.

M. Boubekker, "Bandwidth Reduction for the Transmission of Sign Language Over Telephone Lines", Proceedings of the SPIE-The International Society for Optical Engineering, vol. 1001, Part. 1, 1988, pp. 223-230.

S. Bramblett, "Connect Terminals to Your CPU Over PBX Telephone Lines", EDN, vol. 31, No. 5, Mar. 6, 1986, pp. 239-243, 245, 246 and 248.

G.D. Carse, "New and Future Technologies in the Local Telephone Network: The Victoria System", Conference: IEEE International Conference on Communications '86, ICC '86: Integrating the World Through Communications Conference Record, Jun. 22-25, 1986, Toronto, Ontario, Canada, pp. 410-412.

D.G.J. Fanshawe, "Architures for Home Systems", Conference: IEEE Colloquium on Home Systems-Information, Entertainment and Control, Oct. 1, 1990, London, United Kingdom, pp. 3/1-3/3.

M. Inoue, et al., "A Home Automation System", IEEE Transactions on Consumer Electronics, vol. CE-31, No. 3, Aug. 1985, pp. 516-527.

S. Motoyama, et al., "A Subscriber Loop Multiplexing System for Integrated Service Digital Networks", Conference: NTC '81, IEEE 1981 National Telecommunications Conference, Innovative Telecommunications-Key to the Future, Nov. 29-Dec. 3, 1981, New Orleans, Louisiana, pp. D5.1.1-D2.1.5.

G. Neumann, Flexible and Cost-Minimising System Concept (Ericsson Digital PABX MD 110), NET Nechrichten Elektronik-Telematik, Special Issue, Mar. 1988, pp. 11, 12, 14 and 15.

A. Pietrasik, et al., "Subscriber Carrier Telephony System 1+1", Wiadomosci Telekomunikacyjne, vol. 17, No. 7-8, Jul.-Aug. 1977, pp. 183-198.

V. Punj, "Broadband Applications and Services of Public Switched Networks", IEEE Transactions on Consumer Electronics, vol. 35, No. 2, May 1989, pp. 106-112.

T. Sodeyama, et al., "Intelligent House", Journal of the Institute of Electronics, Information and Communication Engineers, vol. 72, No. 9, Sep. 1989, pp. 1024-1026.

H. Tanaka, et al., "Telecontrol System VJ-501", National Technical Report, vol. 32, No. 6, Dec. 1986, pp. 809-817.

K. Yamamoto, et al., "New Home Telephone System Using Japanese Home Bus System Standard," IEEE Transactions on Consumer Electronics, vol. 35, No. 3, Aug. 1989, p. 687-697.

T. Yamazakli, et al., "Home Applicance Technologies," NEC Research and Development, No. 96, Mar. 1990, pp. 292-299.

Funkschau, "CEBus: US Households are Being Networked", No. 9, Apr. 1989, pp. 45-47.

"Shared Services (Data/Voice Network)", Communications News, vol. 25, No. 11, Nov. 1988, pp. 46-47.

Freeman, "Telecommunication Transmission Handbook", 2.sup.nd Ed., Cover, 1981, pp. xi-xxvii, Chapter 3 (pp. 79-127), Chapter 5 (pp. 172-252), Chapter 6 (pp. 253-288).

A. Artom, et al., "The Possible Use Of Customer Loop For New Services During The Transition From Analogue To Digital", Revue F.I.T.C.E., Mar.-Apr. 1981, vol. 20, No. 2, pp. 50-56.

A. Artom, et al., "Medium-Term Prospects for New Servies to the Telephone Customers," Conference Record, Jun. 14-18, 1981, Int'l Conf. On Communications, Denver, CO., pp. 14.4.1-14.4-6.

Iloe-Young Noh, "Home Automation", Korea Information Science Society Review, Apr. 1989, vol. 7 No. 2, pp. 40-44, Republic of Korea. (Translation Provided).

Chow, et al., "A Multi-drop In-House ADSL Distribution Network"; IEEE 1994, pp. 456-460.

English Language Abstract for Japanese Patent 1-27358 (64-27358) Jan. 30, 1989.

Bellcore: Request For Information: Asymmetrical Digital Subscriber Line (ADSL) Systems That Support Simplex High-Bit-Rate Access and POTS In The Copper Loop Plant; Jun. 1991.

Introduction to the CEBus Standard; Revision Feb. 5, 1995 Draft Copy (19 pages).

Compaq to Ride The CEbus: by Mark Hachman, EBN Jan. 22, 1996 (1 page).

CEBus Router Testing: IEEE Transactions on Consumer Electronics Nov. 1991, vol. 37 No. 4 (8 pages).

Technical Report TR-001 ADSL Forum System Reference Model; May 1996 (6 pages).

DSLPipe User's Guide; by Ascend Communications, Jun. 3, 1997 (245 pages).

DSLPipe Reference Guide; by Ascend Communications, Jun. 2, 1997 (162 pages).

Ascend DSLPipe-S Features; Posted May 12, 1997 (2 pages).

Broadband Digital Subscriber Line—A Full Service Network for the Copper Plant; Telephony / Jun. 12, 1995, vol. 228 No. 24 (8 pages).

Commtek Intros Video over UTP; Communications Week, Feb. 10, 1992 (3 pages).

Aurelio Amodei, et al., "Increasing the Throughput of the HomePNA MAC Protocol, IEEE, Proceedings of the 29th Annual IEEE International Conference on Local Computer Networks (LCN '04), 8 Pages", Nov. 1, 2004, 8 pages(s), None. cited by other.

"Home Phoneline Networking Alliance", Interface Specification for HomePNA 2.0 10M8 Technology Link Layer Protocol, (Dec. 1, 1999), p. 1-39.

"Home Phoneline Networking Alliance", Interface Specification for HomePNA 2.0 10M8 Technology, (Dec. 1, 1999), pp. 1-77.

Paola Bisaglia, et al., Receiver Architectures for HomePNA 2.0 , Hewlett Packard Laboratories, Bristol, U.K., Oct. 17, 2001.

Loh, L.; Ozturk, Y.; Quality of Support and Priority Management in HomePNA 2.0 Link Layer.quadrature..quadrature. Computers and Communication; Jun. 30-Jul. 3, 2003. (ISCC 2003). Proceedings. Eighth IEEE International Symposium; pp. 861-866 vol. 2.

Phoneline / HPNA / HomePNA Networks, http://www.homenethelp.com/web/howto/HomeNet-HPNA.asp (visited Jul. 29, 2003) (3 pages).

Anonymous, HomePNA Specification 1.0 Field Tests Status, Mar. 1999, Home Phoneline Networking Alliance, Inc, pp. 1-6.

Simple, High-Speed Ethernet Technology For The Home, White Paper, Home Phoneline Networking Alliance, Jun. 1998, pp. 1-11.

Information on Home PhoneLine Networking Alliance (Home PNA), dated Jun. 1998 and before.

M. Coronaro, et al., "Integrated Office Communication System," Electrical Communication, 1986, pp. 17-22, vol. 60, No. 1, FACE Research Center, Pomezia, Italy.

Lon Works LPI-10 Link Power Interface Module User's Guide; Echelon Corporation, 1995 (37 pages).

Lon Works LPT-10 Link Power Transceiver User's Guide Version 2.1; Echelon Corporation, 1995 (60 pages).

**US 7,522,714 B2**

Page 8

Lon Works Router User's Guide Revision 3; Echelon Corporation, 1995 (68 pages).

Using the Lon Works PLT-22 Power Line Transceiver in European Utility Application, Version 1; Echelon Corporation, 1996-1999 (118 pages).

PL3120/PL3150 Power Line Smart Transceiver Data Book, Version 2; Echelon Corporation, 1996-2005 (255 pages).

PL DSK 2.1 Power Line Smart Transceiver Development Support Kit User's Guide; Echelon Corporation, 2005-2006 (18 pages).

Introduction to Pyxos FT Platform; Echelon Corporation, 2007 (34 pages).

LTM-10A User's Guide, Revision 4; Echelon Corporation, 1995-2001 (46 pages).

Lon Works Twisted Pair Control Module, User's Guide Version 2; Echelon Corporation, 1992-1996 (50 pages).

AN1000EVK Evaluation Unit Manual, Draft 1.0; Adaptive Networks Inc., Document No. 04-3170-01-B Aug. 1996 (31 pages).

AN1000 Powerline Network Communications Chip Set, Adaptive Networks Inc., 1995 (56 pages).

From the Ether—Bob Metcalfe, 'Cheap, reliable net connections may be as close as an electrical socket'; by Bob Metcalfe Info World Feb. 10, 1997 vol. 19 Issue 6 (4 pages).

Lon Works Custom Node Development, Lon Works Engineering Bulletin; Echelon Corporation, Jan. 1995 (16 pages).

Building a Lon Talk-to-PLC Gateway, Lon Works Engineering Bulletin; Echelon Corporation, May 1994 (62 pages).

Lon Works 78kbps Self-Healing Ring Architecture, Lon Works Marketing Bulletin; Echelon Corporation, Aug. 1993 (6 pages).

Centralized Commercial Building Applications with the Lon Works PLT-21 Power Line Transceiver, Lon Works Engineering Bulletin; Echelon Corporation, Apr. 1997 (22 pages).

Lon Works for Audio Computer Control Network Applications; Echelon Corporation, Jan. 1995 (30 pages).

Demand Side Management with Lon Works Power Line Transceivers, Lon Works Engineering Bulletin; Echelon Corporation, Dec. 1996 (36 pages).

'Switching Hubs—Switching to the Fast Track', by Gary Gunnerson, PC Magazine, Oct. 11, 1994 (24 pages).

VISPLAN-10 Infrared Wireless LAN system; JVC May 1996 (10 pages).

'JVC Introduces Ethernet Compatible Wireless LAN System'; Business Wire Sep. 26, 1995 (1 page).

Ethernet Wireless LAN Systems; BYTE Feb. 1996 (3 pages).

'JVC Introduces First Ethernet Compatible Wireless LAN System'; Business Wire Nov. 8, 1995 (1 page).

Intelogis to Present on Stage at Internet Showcase 1998; PR Newswire Jan. 28, 1998 (1 page).

PassPort PC Plug In Quick Setup Guide; Intelogis P/N 30030202, date unknown (8 pages).

High Speed Networking with LAN Switches, by Gilbert Held; Copyright 1997 by John Wiley & Sons, Inc. (290 pages).

48-Volt DC Power Supply Connection Guide: 3Com Published Mar. 2000 (12 pages).

SuperStack II PS Hub User Guide; 3Com Published Jul. 1997 (188 pages).

SuperStack II Entry Hub User Guide; 3Com Published Nov. 1996 (8 pages).

SuperStack II Baseline Switch User Guide; 3Com Published Mar. 1998 (8 pages).

SuperStack II Baseline 10/100 switch; 3Com Published Apr. 1998 (8 pages).

SuperStack II Desktop Switch User Guide; 3Com Published Jun. 1997 (148 pages).

SuperStack II Switch 610 User Guide; 3Com Published May 1999 (54 pages).

Line carrier modems—1: Build a Pair of Line-Carrier Modems (Part 1); Radio Electronics, Jul. 1988, pp. 87-91 by Keith Nichols (7 pages).

Line carrier modems—2: Build a Pair of Line-Carrier Modems (Part 2); Radio Electronics, Aug. 1988, pp. 88-96 by Keith Nichols (5 pages).

Universal Serial Bus Specification Revision 1.0; Jan. 15, 1996 (268 pages).

3ComImpact IQ External ISDN Modem User product brochure; Published Jun. 1996 (4 pages).

3ComImpact IQ External ISDN Modem User Guide; Published Jul. 1997 (157 pages).

Cisco Catalyst 5000 Series Configuration Worksheet, 1996 (11 pages).

Cisco Catalyst 5000 Product Announcement, Published 1996 (22 pages).

Cisco Catalyst 5000 ATM Dual PHY LAN Emulation Module; Posted Sep. 24, 1996 (4 pages).

Cisco Catalyst 5000 Group Switching Ethernet Modules; Posted May 6, 1996 (5 pages).

The Mac reborn; Macworld Sep. 1996, p. 104-115 (16 pages).

The Mac reborn; Macworld vol. 13, Issue 9, Sep. 1996 (9 pages).

Cisco Catalyst 5000; Industry's First Modular, Multilayer-Capable switching System for the Wiring Closet; Posted May 16, 1996 (22 pages).

Canned Heat; Data Communications Feb. 1996 (10 pages).

Fast Ethernet 100-Mbps Solutions; Posted Mar. 112, 1996 (10 pages).

Forget the Forklift; Data Communications Sep. 1996 (11 pages).

LAN Emulation; Posted Nov. 15, 1995 (16 pages).

IBM LAN Bridge and Switch Summary, IBM, published Jan. 1996 (70 pages).

Continuation of IBM LAN Bridge and Switch Summary, IBM, published Jan. 1996 (70 pages).

Grayson Evans, The Cebus Standard User's Guide May, 1996 (317 pages).

Technical Report TR-001 ADSL Forum System Reference Model May, 1996 (6 pages).

Motorola CableComm CyberSURFR Cable Modem Specifications; Apr. 1998 (4 pages).

IS-60.04; Node Communications Protocol Part 6: Application Layer Specification; Revision Apr. 18, 1996 (129 pages).

Hoffman, J.; "Cable, Television, and the Consumer Electronic Bus"; Panasonic Technologies, Inc., (date unknown) pp. 165-173.

Strassberg, Dan; "Home Automation Buses; Protocols Really Hit Home"; EDN Design Feature, Apr. 13, 1995 (9 pages).

* cited by examiner



**FIG. 1. (PRIOR ART)**



**FIG. 2. (PRIOR ART)**



FIG. 3.



FIG. 4.



**FIG. 5.**



**FIG. 6.**



**FIG. 7.**



**FIG. 8.**



FIG. 9.



FIG. 10.



**FIG. 11A.**



**FIG. 11B.**



Start

Mechanically remove existing
telephone outlet from wall                    122

Electrically disconnect existing
outlet from telephone line                    124

Split or form telephone line
into 2 segments                               126

Electrically connect network
outlet to 2 telephone line
segments                                      128

Mechanically secure network
outlet to wall                                130

FIG. 12.



**FIG. 13.**

US 7,522,714 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**TELEPHONE OUTLET FOR IMPLEMENTING A LOCAL AREA NETWORK OVER TELEPHONE LINES AND A LOCAL AREA NETWORK USING SUCH OUTLETS**

FIELD OF THE INVENTION

The present invention relates to the field of wired communication systems, and, more specifically, to the networking of devices using telephone lines.

BACKGROUND OF THE INVENTION

FIG. 1 shows the wiring configuration for a prior-art telephone system 10 for a residence or other building, wired with a telephone line 5. Residence telephone line 5 consists of single wire pair which connects to a junction-box 16, which in turn connects to a Public Switched Telephone Network (PSTN) 18 via a cable 17, terminating in a public switch 19, apparatus which establishes and enables telephony from one telephone to another. The term "analog telephony" herein denotes traditional analog low-frequency audio voice signals typically under 3 KHz, sometimes referred to as "POTS" ("plain old telephone service"), whereas the term "telephony" in general denotes any kind of telephone service, including digital service such as Integrated Services Digital Network (ISDN). The term "high-frequency" herein denotes any frequency substantially above such analog telephony audio frequencies, such as that used for data. ISDN typically uses frequencies not exceeding 100 Khz (typically the energy is concentrated around 40 Khz). The term "telephone line" herein denotes electrically-conducting lines which are intended primarily for the carrying and distribution of analog telephony, and includes, but is not limited to, such lines which may be pre-existing within a building and which may currently provide analog telephony service. The term "telephone device" herein denotes, without limitation, any apparatus for telephony (including both analog telephony and ISDN), as well as any device using telephony signals, such as fax, voice-modem, and so forth.

Junction box 16 is used to separate the in-home circuitry from the PSTN and is used as a test facility for troubleshooting as well as for wiring new telephone outlets in the home. A plurality of telephones 13a, 13b, and 13c connects to telephone line 5 via a plurality of telephone outlets 11a, 11b, 11c, and 11d. Each telephone outlet has a connector (often referred to as a "jack") denoted in FIG. 1 as 12a, 12b, 12c, and 12d, respectively. Each telephone outlet may be connected to a telephone via a connector (often referred to as a "plug"), denoted in FIG. 1 (for the three telephone illustrated) as 14a, 14b, and 14c, respectively. It is also important to note that lines 5a, 5b, 5c, 5d, and 5e are electrically the same paired conductors.

There is a requirement for using the existing telephone infrastructure for both telephone and data networking. In this way, the task of establishing a new local area network in a home or other building is simplified, because there would be no additional wires to install. U.S. Pat. No. 4,766,402 to Crane (hereinafter referred to as "Crane") teaches a way to form LAN over two-wire telephone lines, but without the telephone service.

The concept of frequency domain/division multiplexing (FDM) is well-known in the art, and provides means of splitting the bandwidth carried by a wire into a low-frequency band capable of carrying an analog telephony signal and a high-frequency band capable of carrying data communica-

tion or other signals. Such a mechanism is described for example in U.S. Pat. No. 4,785,448 to Reichert et al. (hereinafter referred to as "Reichert"). Also is widely used are xDSL systems, primarily Asymmetric Digital Subscriber Loop (ADSL) systems.

Relevant prior art in this field is also disclosed in U.S. Pat. No. 5,896,443 to Dichter (hereinafter referred to as "Dichter"). Dichter is the first to suggest a method and apparatus for applying such a technique for residence telephone wiring, enabling simultaneously carrying telephone and data communication signals. The Dichter network is illustrated in FIG. 2, which shows a network 20 serving both telephones and a local area network. Data Terminal Equipment (DTE) units 24a, 24b, and 24c are connected to the local area network via Data Communication Equipment (DCE) units 23a, 23b, and 23c, respectively. Examples of Data Communication Equipment include modems, line drivers, line receivers, and transceivers. DCE units 23a, 23b, and 23c are respectively connected to high pass filters (HPF) 22a, 22b, and 22c. The HPF's allow the DCE units access to the high-frequency band carried by telephone line 5. In a first embodiment (not shown in FIG. 2), telephones 13a, 13b, and 13c are directly connected to telephone line 5 via connectors 14a, 14b, and 14c, respectively. However, in order to avoid interference to the data network caused by the telephones, a second embodiment is suggested (shown in FIG. 2), wherein low pass filters (LPF's) 21a, 21b, and 21c are added to isolate telephones 13a, 13b, and 13c from telephone line 5. Furthermore, a low pass filter must also be connected to Junction-Box 16, in order to filter noises induced from or to the PSTN wiring 17. As is the case in FIG. 1, it is important to note that lines 5a, 5b, 5c, 5d, and 5e are electrically the same paired conductors.

However, the Dichter network suffers from degraded data communication performance, because of the following drawbacks:

1. Induced noise in the band used by the data communication network is distributed throughout the network. The telephone line within a building serves as a long antenna, receiving electromagnetic noise produced from outside the building or by local equipment such as air-conditioning systems, appliances, and so forth. Electrical noise in the frequency band used by the data communication network can be induced in the extremities of telephone line 5 (line 5e or 5a in FIG. 2) and propagated via telephone line 5 throughout the whole system. This is liable to cause errors in the data transportation.

2. The wiring media consists of a single long wire (telephone line 5). In order to ensure a proper impedance match to this transmission-line, it is necessary to install terminators at each end of telephone line 5. One of the advantages of using the telephone infrastructure for a data network, however, is to avoid replacing the internal wiring. Thus, either such terminators must be installed at additional cost, or suffer the performance problems associated with an impedance mismatch.

3. In the case where LPF 21 is not fitted to the telephones 13, each connected telephone appears as a non-terminated stub, and this is liable to cause undesirable signal reflections.

4. In one embodiment, LPF 21 is to be attached to each telephone 13. In such a configuration, an additional modification to the telephone itself is required. This further makes the implementation of such system complex and costly, and defeats the purpose of using an existing telephone line and telephone sets 'as is' for a data network.

US 7,522,714 B2

3

5. The data communication network used in the Dichter network supports only the 'bus' type of data communication network, wherein all devices share the same physical media Such topology suffers from a number of drawbacks, as described in U.S. Pat. No. 5,841,360 to the present inventor. which is incorporated by reference for all purposes as if fully set forth herein. Dichter also discloses drawbacks of the bus topology, including the need for bus mastering and logic to contend with the data packet collision problem. Topologies that are preferable to the bus topology include the Token-Ring (IEEE 803), the PSIC network according to U.S. Pat. No. 5,841,360, and other point-to-point networks known in the art (such as a serial point-to-point 'daisy chain' network). Such networks are in most cases superior to 'bus' topology systems.

The above drawbacks affect the data communication performance of the Dichter network, and therefore limit the total distance and the maximum data rate such a network can support. In addition, the Dichter network typically requires a complex and therefore costly transceiver to support the data communication system. While the Reichert network relies on a star topology and does not suffer from these drawbacks of the bus topology, the star topology also has disadvantages. First, the star topology requires a complex and costly hub module, whose capacity limits the capacity of the network. Furthermore, the star configuration requires that there exist wiring from every device on the network to a central location, where the hub module is situated. This may be impractical and/or expensive to achieve, especially in the case where the wiring of an existing telephone system is to be utilized. The Reichert network is intended for use only in offices where a central telephone connection point already exists. Moreover, the Reichert network requires a separate telephone line for each separate telephone device, and this, too, may be impractical and/or expensive to achieve.

Although the above-mentioned prior-art networks utilize existing in-home telephone lines and feature easy installation and use without any additions or modifications to the telephone line infrastructure (wires, outlets, etc.), they require dedicated, non-standard, and complex DCE's, modems, and filters, and cannot employ standard interfaces. For example, Ethernet (such as IEEE802.3) and other standards are commonly used for personal computers communication in Local Area network (LAN) environments. With prior-art techniques, in order to support communication between computers, each computer must be equipped with an additional modem for communicating over the telephone line. Whether these additional modems are integrated into the computer (e.g. as plug-in or built-in hardware) or are furnished as external units between the computer and the telephone line, additional equipment is required. The prior-art networks therefore incur additional cost, space, installation labor, electricity, and complexity. It would therefore be desirable to provide a network which contains integral therewith the necessary standard interfaces, thereby obviating the need to provide such interfaces in the DTE's.

There is thus a widely-recognized need for, and it would be highly advantageous to have, a means for implementing a data communication network using existing telephone lines of arbitrary topology, which continues to support analog telephony, while also allowing for improved communication characteristics by supporting a point-to-point topology network.

Furthermore, there is also a need for, and it would be highly advantageous to have, a means and method for implementing such an in-house data communication network using existing

4

telephone lines, wherein the DTE's (e.g. computers, appliances) can be interconnected solely by using standard interfaces, without the need for modifications or adding external units to the DTE's.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a method and apparatus for upgrading an existing telephone line wiring system within a residence or other building, to provide both analog telephony service and a local area data network featuring a serial "daisy chained" or other arbitrary topology.

To this end, the regular telephone outlets are first replaced with network outlets to allow splitting of the telephone line having two or more conductors into segments such that each segment connecting two network outlets is fully separated from all other segments. Each segment has two ends, to which various devices, other segments, and so forth, may be connected via the network outlets, and are such that the segments can concurrently transport telephony and data communications signals. A network outlet contains a low pass filter, which is connected in series to each end of the segment, thereby forming a low-frequency between the external ports of the low pass filters, utilizing the low-frequency band. Similarly, a network outlet contains a high pass filter, which is connected in series to each end of the segment, thereby forming a high-frequency path between the external ports of the high pass filters, utilizing the high-frequency band The bandwidth carried by the segments is thereby split into non-overlapping frequency bands, and the distinct paths can be interconnected via the high pass filters and low pass filters as coupling and isolating devices to form different paths. Depending on how the devices and paths are selectively connected, these paths may be simultaneously different for different frequencies. A low-frequency band is allocated to regular telephone service (analog telephony), while a high-frequency band is allocated to the data communication network. In the low-frequency (analog telephony) band, the wiring composed of the coupled low-frequency paths appears as a normal telephone line, in such a way that the low-frequency (analog telephony) band is coupled among all the segments and is accessible to telephone devices at any network outlet, whereas the segments may remain individually isolated in the high-frequency (data) band, so that in this data band the communication media, if desired, can appear to be point-to-point (such as a serialized "daisy chain") from one network outlet to the next. The term "low pass filter" herein denotes any device that passes signals in the low-frequency (analog telephony) band but blocks signals in the high-frequency (data) band. Conversely, the term "high pass filter" herein denotes any device that passes signals in the high-frequency (data) band but blocks signals in the low-frequency (analog telephony) band. The term "data device" herein denotes any apparatus that handles digital data, including without limitation modems, transceivers, Data Communication Equipment, and Data Terminal Equipment.

Each network outlet has a standard data interface connector which is coupled to data interface circuitry for establishing a data connection between one or more segments and a data device, such as Data Terminal Equipment, connected to the data interface connector.

A network according to the present invention allows the telephone devices to be connected as in a normal telephone installation (i.e., in parallel over the telephone lines), but can be configured to virtually any desired topology for data transport and distribution, as determined by the available existing

US 7,522,714 B2

5

telephone line wiring and without being constrained to any predetermined data network topology. Moreover, such a network offers the potential for the improved data transport and distribution performance of a point-to-point network topology, while still allowing a bus-type data network topology in all or part of the network if desired. This is in contrast to the prior art, which constrains the network topology to a predetermined type.

Data Terminal Equipment as well as telephone devices can be readily connected to the network outlets using standard interfaces and connectors, thereby allowing a data communications network as well as a telephone system to be easily configured, such that both the data communications network and the telephone system can operate simultaneously without interference between one another.

A network according to the present invention may be used advantageously when connected to external systems and networks, such as XDSL, ADSL, as well as the Internet.

In a first embodiment, the high pass filters are connected in such a way to create a virtual 'bus' topology for the high-frequency band, allowing for a local area network based on DCE units or transceivers connected to the segments via the high pass filters. In a second embodiment, each segment end is connected to a dedicated modem, hence offering a serial point-to-point daisy chain network. In all embodiments of the present invention, DTE units or other devices connected to the DCE units can communicate over the telephone line without interfering with, or being affected by, simultaneous analog telephony service. Unlike prior-art networks, the topology of a network according to the present invention is not constrained to a particular network topology determined in advance, but can be adapted to the configuration of an existing telephone line installation. Moreover, embodiments of the present invention that feature point-to-point data network topologies exhibit the superior performance characteristics that such topologies offer over the bus network topologies of the prior art, such as the Dichter network and the Crane network.

Therefore, according to a first aspect of the present invention there is provided a local area network within a building, for transporting data among a plurality of data devices, the local area network including:

(a) at least two network outlets, each of said network outlets having:
  i) at least one data interface connector and data interface circuitry coupled to said data interface connector and operative to establishing a data connection between a data device and said data interface connector;
  ii) at least one standard telephone connector operative to supporting standard telephony service by connecting a standard telephone device;
  iii) a splitter operative to separating telephony and data communications signals; and
  iv) a coupler operative to combining telephony and data communications signals;
(b) at least one telephone line segment within the walls of the building, each said telephone line segment connecting at least two of said network outlets and having at least two conductors, said telephone line segment operative to concurrently transporting telephony and data communication signals; and
(c) at least one modem housed within each of said network outlets for establishing a data connection over said at least one telephone line segment, said at least one modem operative to transmitting and receiving signals over said telephone line segment, and coupled thereto.

6

According to a second aspect of the invention there is provided a network outlet for configuring a local area network for the transport of data across telephone lines and for enabling telephony across the telephone lines simultaneous with the transport of data, the network outlet comprising:

(a) at least one data interface connector and data interface circuitry coupled to said at least one data interface connector and being jointly operative to establishing a data connection between a data device and said at least one data interface connector;
(b) at least one telephone connector operative to supporting standard telephony service by connecting a standard telephone device thereto;
(c) a splitter adapted to be coupled to the telephone lines and being operative to separating telephony and data communications signals transported over the telephone lines; and
(d) a coupler having an output adapted to be coupled to the telephone lines and being operative to combining telephony and data communications signals to be transported over the telephone lines.

According to a third aspect, the invention provides a method for upgrading an existing telephone system to operate both for telephony and as a local area network for transporting data among a plurality of data devices, the telephone system having a plurality of telephone outlets connected to at least one telephone line within the walls of a building, the method comprising the steps of:

(a) mechanically removing at least two of the telephone outlets from the walls of the building;
(b) electrically disconnecting said at least two telephone outlets from the at least one telephone line;
(c) providing at least two network outlets, each of said network outlets having a data interface connector and data interface circuitry coupled to said data interface connector and operative to establishing a data connection between a data device and said data interface connector;
(d) electrically connecting said network outlets to the at least one telephone line; and
(e) mechanically securing said network outlets to the wall.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention is herein described, by way of non-limiting example only, with reference to the accompanying drawings, wherein:

FIG. 1 shows a common prior art telephone line wiring configuration for a residence or other building.

FIG. 2 shows a prior art local area network based on telephone line wiring for a residence or other building.

FIG. 3 shows modifications to telephone line wiring according to the present invention for a local area network.

FIG. 4 shows modifications to telephone line wiring according to the present invention, to support regular telephone service operation.

FIG. 5 shows a splitter according to the present invention.

FIG. 6 shows a local area network based on telephone lines according to the present invention, wherein the network supports two devices at adjacent network outlets.

FIG. 7 shows a first embodiment of a local area network based on telephone lines according to the present invention, wherein the network supports two devices at non-adjacent network outlets.

FIG. 8 shows a second embodiment of a local area network based on telephone lines according to the present invention, wherein the network supports three devices at adjacent network outlets.

FIG. 9 shows third embodiment of a local area network based on telephone lines according to the present invention, wherein the network is a bus type network.

FIG. 10 shows a node of local area network based on telephone lines according to the present invention.

FIG. 11A shows a fourth embodiment of a local area network based on telephone lines according to the present invention.

FIG. 11B shows an embodiment of the present invention for use with telephone wiring that is not separated into distinct segments.

FIG. 12 is a flowchart illustrating the sequence of steps in an installation method according to the present invention for upgrading an existing telephone system.

FIG. 13 illustrates the components of a basic kit according to the present invention for upgrading a telephone system to a local area data network.

DETAILED DESCRIPTION OF PREFERRED
EMBODIMENTS

The principles and operation of a network according to the present invention may be understood with reference to the drawings and the accompanying description. The drawings and descriptions are conceptual only. In actual practice, a single component can implement one or more functions; alternatively, each function can be implemented by a plurality of components and circuits. In the drawings and descriptions, identical reference numerals indicate those components which are common to different embodiments or configurations.

The basic concept of the invention is shown in FIG. 3. A network 30 is based on network outlets 31a, 31b, 31c, and 31d. The installation of a network supporting both telephony and data communications relates to the installation of such network outlets. Similarly, the upgrade of an existing telephone system relates to replacing the existing telephone outlets with network outlets. In the descriptions which follow, an upgrade of an existing telephone system is assumed, but the procedures can also be applied in a like manner for an initial installation that supports both telephony and data communications.

A network outlet is physically similar in size, shape, and overall appearance to a standard telephone outlet, so that a network outlet can be substituted for a standard telephone outlet in the building wall. No changes are required in the overall telephone line layout or configuration. The wiring is changed by separating the wires at each network outlet into distinct segments of electrically-conducting media. Thus, each segment connecting two network outlets can be individually accessed from either end. In the prior art Dichter network, the telephone wiring is not changed, and is continuously conductive from junction box 16 throughout the system. According to the present invention, the telephone line is broken into electrically distinct isolated segments 15a, 15b, 15c, 15d, and 15e, each of which connects two network outlets. In order to fully access the media, each of connectors 32a, 32b, 32c, and 32d must support four connections, two in each segment. This modification to the telephone line can be carried out by replacing each of the telephone outlets 31a, 31b, 31c, and 31d. As will be explained later, the substitutions need be performed only at those places where it is desirable to be able to connect to data network devices. A minimum of two

telephone outlets must be replaced with network outlets, enabling data communication between those network outlets only.

FIG. 4 shows how a network 40 of the present invention continues to support regular telephone service, by the installation of jumpers 41a, 41b, 41c, and 41d in network outlets 31a, 31b, 31c and 31d respectively. At each network outlet where they are installed, the jumpers connect both segment ends and allow telephone connection to the combined segment. Installation of a jumper effects a re-connection of the split telephone line at the point of installation. Installation of jumpers at all network outlets would reconstruct the prior art telephone line configuration as shown in FIG. 1. Such jumpers can be add-ons to the network outlets, integrated within the network outlets, or integrated into a separate module. Alternately, a jumper can be integrated within a telephone set, as part of connector 14. The term "jumper" herein denotes any device for selectively coupling or isolating the distinct segments in a way that is not specific to the frequency band of the coupled or isolated signals. Jumper 41 can be implemented with a simple electrical connection between the connection points of connector 32 and the external connection of the telephone.

As described above, jumpers 41 are to be installed in all network outlets which are not required for connection to the data communication network. Those network outlets which are required to support data communication connections, however, will not use jumper 41 but rather a splitter 50, shown in FIG. 5. Such a splitter connects to both segments in each network outlet 31 via connector 32, using a port 54 for a first connection and a port 55 for a second connection. Splitter 50 has two LPF's for maintaining the continuity of the audio/ telephone low-frequency band. After low pass filtering by LPF 51a for the port 54 and LPF 51b for port 55, the analog telephony signals are connected together and connected to a telephone connector 53, which may be a standard telephone connector. Hence, from the telephone signal point of view, the splitter 50 provides the same continuity and telephone access provided by the jumper 41. On the other hand, the data communication network employs the high-frequency band, access to which is made via HPF's 52a and 52b. HPF 52a is connected to port 54 and HPF 52b is connected to port 55. The high pass filtered signals are not passed from port 54 to port 55, but are kept separate, and are routed to a data interface connector 56 and a data interface connector 57, respectively, which may be standard data connectors. The term "splitter" herein denotes any device for selectively coupling or isolating the distinct segments that is specific to the frequency band of the coupled or isolated signals. The term "coupler" is used herein in reference to any device used for combining separate signals into a combined signal encompassing the originally-separate signals, including a device such as a splitter used for signal coupling.

Therefore, when installed in a network outlet, splitter 50 serves two functions. With respect to the low-frequency analog telephony band, splitter 50 establishes a coupling to effect the prior-art configuration shown in FIG. 1, wherein all telephone devices in the premises are connected virtually in parallel via the telephone line, as if the telephone line were not broken into segments. On the other hand, with respect to the high-frequency data communication network, splitter 50 establishes electrical isolation to effect the configuration shown in FIG. 3, wherein the segments are separated, and access to each segment end is provided by the network outlets. With the use of splitters, the telephone system and the data communication network are actually decoupled, with each supporting a different topology.

**9**

FIG. 6 shows a first embodiment of a data communication network **60** between two DTE units **24a** and **24b**, connected to adjacent network outlets **31b** and **31c**, which are connected together via a single segment **15c**. Splitters **50a** and **50b** are connected to network outlets **31b** and **31c** via connectors **32b** and **32c**, respectively. As explained above, the splitters allow transparent audio/telephone signal connection. Thus, for analog telephony, the telephone line remains virtually unchanged, allowing access to telephone external connection **17** via junction box **16** for telephones **13a** and **13c**. Likewise, telephone **13b** connected via connector **14b** to a connector **53a** on splitter **50a**, is also connected to the telephone line. In a similar way, an additional telephone can be added to network outlet **31c** by connecting the telephone to connector **53b** on splitter **50b**. It should be clear that connecting a telephone to a network outlet, either via jumper **41** or via splitter **50** does not affect the data communication network.

Network **60** (FIG. 6) supports data communication by providing a communication path between port **57a** of splitter **50a** and port **56b** of splitter **50b**. Between those ports there exists a point-to-point connection for the high-frequency portion of the signal spectrum, as determined by HPF **52a** and **52b** within splitters **50** (FIG. 5). This path can be used to establish a communication link between DTE units **24a** and **24b**, by means of DCE units **23a** and **23b**, which are respectively connected to ports **57a** and **56b**. The communication between DTE units **24a** and **24b** can be unidirectional, half-duplex, or full-duplex. The only limitation imposed on the communication system is the capability to use the high-frequency portion of the spectrum of segment **15c**. As an example, the implementation of data transmission over a telephone line point-to-point system described in Reichert can also be used in network **60**. Reichert implements both LPF and HPF by means of a transformer with a capacitor connected in the center-tap, as is well-known in the art. Similarly, splitter **50** can be easily implemented by two such circuits, one for each side.

It should also be apparent that HPF **52a** in splitter **50a** and HPF **52b** in splitter **50b** can be omitted, because neither port **56a** in splitter **50a** nor port **57b** in splitter **50b** is connected.

Network **60** provides clear advantages over the networks described in the prior art. First, the communication media supports point-to-point connections, which are known to be superior to multi-tap (bus) connections for communication performance. In addition, terminators can be used within each splitter or DCE unit, providing a superior match to the transmission line characteristics. Furthermore, no taps (drops) exists in the media, thereby avoiding impedance matching problems and the reflections that result therefrom.

Moreover, the data communication system in network **60** is isolated from noises from both the network and the 'left' part of the telephone network (Segments **15a** and **15b**), as well as noises induced from the 'right' portion of the network (Segments **15d** and **15e**). Such isolation is not provided in any prior-art implementation. Dichter suggests installation of a low pass filter in the junction box, which is not a satisfactory solution since the junction box is usually owned by the telephone service provider and cannot always be accessed. Furthermore, safety issues such as isolation, lightning protection, power-cross and other issues are involved in such a modification.

Implementing splitter **50** by passive components only, such as two transformers and two center-tap capacitors, is also advantageous, since the reliability of the telephone service will not be degraded, even in the case of failure in any DCE unit, and furthermore requires no external power. This accommodates a 'life-line' function, which provides for con-

**10**

tinuous telephone service even in the event of other system malfunction (e.g. electrical failures).

The splitter **50** can be integrated into network outlet **31**. In such a case, network outlets equipped with splitter **50** will have two types of connectors: One regular telephone connector based on port **53**, and one or two connectors providing access to ports **56** and **57** (a single quadruple-circuit connector or two double-circuit connectors). Alternatively, splitter **50** can be an independent module attached as an add-on to network outlet **31**. In another embodiment, the splitter is included as part of DCE **23**. However, in order for network **60** to operate properly, either jumper **41** or splitter **50** must be employed in network outlet **31** as modified in order to split connector **32** according to the present invention, allowing the retaining of regular telephone service.

FIG. 7 also shows data communication between two DTE units **24a** and **24b** in a network **70**. However, in the case of network **70**, DTE units **24a** and **24b** are located at network outlets **31b** and **31d**, which are not directly connected, but have an additional network outlet **31c** interposed between. Network outlet **31c** is connected to network outlet **31b** via a segment **15c**, and to network outlet **31d** via a segment **15d**.

In one embodiment of network **70**, a jumper (not shown, but similar to jumper **41** in FIG. 4) is connected to a connector **32c** in network outlet **31c**. The previous discussion regarding the splitting of the signal spectrum also applies here, and allows for data transport between DTE units **24a** and **24b** via the high-frequency portion of the spectrum across segments **15c** and **15d**. When only jumper **41** is connected at network outlet **31c**, the same point-to-point performance as previously discussed can be expected; the only influence on communication performance is from the addition of segment **15d**, which extends the length of the media and hence leads to increased signal attenuation. Some degradation, however, can also be expected when a telephone is connected to jumper **41** at network outlet **31c**. Such degradation can be the result of noise produced by the telephone in the high-frequency data communication band, as well as the result the addition of a tap caused by the telephone connection, which usually has a non-matched termination. Those problems can be overcome by installing a low pass filter in the telephone.

In a preferred embodiment of network **70**, a splitter **50b** is installed in network outlet **31c**. Splitter **50b** provides the LPF functionality, and allows for connecting a telephone via connector **53b**. However, in order to allow for continuity in data communication, there must be a connection between the circuits in connectors **56b** and **57b**. Such a connection is obtained by a jumper **71**, as shown in FIG. 7. Installation of splitter **50b** and jumper **71** provides good communication performance, similar to network **60** (FIG. 6). From this discussion of a system wherein there is only one unused network outlet between the network outlets to which the DTE units are connected, it should be clear that the any number of unused network outlets between the network outlets to which the DTE units are connected can be handled in the same manner.

For the purpose of the foregoing discussions, only two communicating DTE units have been described. However, the present invention can be easily applied to any number of DTE units. FIG. 8 illustrates a network **80** supporting three DTE units **24a**, **24b**, and **24c**, connected thereto via DCE units **23a**, **23b**, and **23c**, respectively. The structure of network **80** is the same as that of network **70** (FIG. 7), with the exception of the substitution of jumper **71** with a jumper **81**. Jumper **81** makes a connection between ports **56b** and **57b** in the same way as does jumper **71**. However, in a manner similar to that of jumper **41** (FIG. 4), jumper **81** further allows for an external connection to the joined circuits, allowing the

11

connection of external unit, such as a DCE unit 23c. In this way, segments 15c and 15d appear electrically-connected for high-frequency signals, and constitute media for a data communication network connecting DTE units 24a, 24b, and 24c. Obviously, this configuration can be adapted to any number of network outlets and DTE units. In fact, any data communication network which supports a 'bus' or multi-point connection over two-conductor media, and which also makes use of the higher-frequency part of the spectrum can be used. In addition, the discussion and techniques explained in the Dichter patent are equally applicable here. Some networks, such as Ethernet IEEE 802.3 interface 10BaseT and 100BaseTX, require a four-conductor connection, two conductors (usually single twisted-wire pair) for transmitting, and two conductors (usually another twisted-wire pair) for receiving. As is known in the art, a four-to-two wires converter (commonly known as hybrid) can be used to convert the four wires required into two, thereby allowing network data transport over telephone lines according to the present invention. A network according to the present invention can therefore be an Ethernet network.

As with jumper 41 (FIG. 4), jumper 81 can be an integral part of splitter 50, an integral part of DCE 23, or a separate component.

In order to simplify the installation and operation of a network, it is beneficial to use the same equipment in all parts of the network. One such embodiment supporting this approach is shown in for a set of three similar network outlets in FIG. 8, illustrating network 80. In network 80, network outlets 31b, 31c, and 31d are similar and are all used as part of the data communication network. Therefore for uniformity, these network outlets are all coupled to splitters 50a, 50b, and 50c respectively, to which jumpers are attached, such as a jumper 81 attached to splitter 50b (the corresponding jumpers attached to splitter 50a and splitter 50c have been omitted from FIG. 8 for clarity), and thus provide connections to local DCE units 23a, 23c, and 23b, respectively. In a preferred embodiment of the present invention, all telephone outlets in the building will be replaced by network outlets which include both splitter 50 and jumper 81 functionalities. Each such network outlet will provide two connectors: one connector coupled to port 53 for a telephone connection, and the other connector coupled to jumper 81 for a DCE connection.

The terms "standard connector", "standard telephone connector", and "standard data connector" are used herein to denote any connectors which are industry-standard or de facto standard connectors. Likewise, the term "standard telephone device" is used herein to denote any telephone device which is a commercial standard or de facto standard telephone device, and the term "standard telephony service" is used herein to denote any commercially-standard or de facto standard telephony.

In yet another embodiment, DCE 23 and splitter 50 are integrated into the housing of network outlet 31, thereby offering a direct DTE connection. In a preferred embodiment, a standard DTE interface is employed.

In most 'bus' type networks, it is occasionally required to split the network into sections, and connect the sections via repeaters (to compensate for long cabling), via bridges (to decouple each section from the others), or via routers. This may also be according to the present invention, as illustrated in FIG. 9 for a network 90, which employs a repeater/bridge/router unit 91. Unit 91 can perform repeating, bridging, routing, or any other function associated with a split between two or more networks. As illustrated, a splitter 50b is coupled to a network outlet 31c, in a manner similar to the other network outlets and splitters of network 90. However, at splitter 50b, no jumper is employed. Instead, a repeater/bridge/router unit

12

91 is connected between port 56b and port 57b, thereby providing a connection between separate parts of network 90. Optionally, unit 91 can also provide an interface to DTE 24c for access to network 90.

As illustrated above, a network outlet can also function as a repeater by the inclusion of the appropriate data interface circuitry. Circuitry implementing modems, and splitters, such as the high pass filters as well as the low pass filters, can function as data interface circuitry.

FIG. 9 also demonstrates the capability of connecting to external DTE units or networks, via a high pass filter 92 connected to a line 15a. Alternatively, HPF 92 can be installed in junction box 16. HPF 92 allows for additional external units to access network 90. As shown in FIG. 9, HPF 92 is coupled to a DCE unit 93, which in turn is connected to a network 94. In this configuration, the local data communication network in the building becomes part of network 94. In one embodiment, network 94 offers ADSL service, thereby allowing the DTE units 24d, 24a, 24c, and 24b within the building to communicate with the ADSL network. The capability of communicating with external DTE units or networks is equally applicable to all other embodiments of the present invention, but for clarity is omitted from the other drawings.

While the foregoing relates to data communication networks employing bus topology, the present invention can also support networks where the physical layer is distinct within each communication link. Such a network can be a Token-Passing or Token-Ring network according to IEEE 802, or preferably a PSIC network as described in U.S. Pat. No. 5,841,360 to the present inventor, which details the advantages of such a topology. FIG. 10 illustrates a node 100 for implementing such a network. Node 100 employs two modems 103a and 103b, which handle the communication physical layer. Modems 103a and 103b are independent, and couple to dedicated communication links 104a and 104b, respectively. Node 100 also features a DTE interface 101 for connecting to a DTE unit (not shown). A control and logic unit 102 manages the higher OSI layers of the data communication above the physical layer, processing the data to and from a connected DTE and handling the network control. Detailed discussion about such node 100 and the functioning thereof can be found in U.S. Pat. No. 5,841,360 and other sources known in the art.

FIG. 11 describes a network 110 containing nodes 100d, 100a, 100b, and 100c coupled directly to splitters 50d, 50a, 50b and 50c, which in turn are coupled to network outlets 31a, 31b, 31c, and 31d respectively. Each node 100 has access to the corresponding splitter 50 via two pairs of contacts, one of which is to connector 56 and the other of which is to connector 57. In his way, for example, node 100a has independent access to both segment 15b and segment 15c. This arrangement allows building a network connecting DTE units 24d, 24a, 24b, and 24c via nodes 100d, 100a, 100b, and 100c, respectively.

For clarity, telephones are omitted from FIGS. 9 and 11, but it should be clear that telephones can be connected or removed without affecting the data communication network. Telephones can be connected as required via connectors 53 of splitters 50. In general, according to the present invention, a telephone can be connected without any modifications either to a splitter 50 (as in FIG. 8) or to a jumper 41 (as in FIG. 4).

The present invention has been so far described in embodiments in which the telephone wiring segments are split, and which therefore modify the original galvanic continuity of the telephone wiring, as shown in FIG. 3. Such embodiments require the removal of outlets in order to access the internal wiring. However, the present invention can be applied

US 7,522,714 B2

13

equally-well to prior-art schemes such as the Dichter network (as illustrated in FIG. 2), wherein the continuity of the telephone wiring is not disturbed, and there the wiring is not split into electrically distinct segments.

Thus, an embodiment of a network utilizing the network outlets of the present invention is shown in FIG. 11B as a network 112. Generally, the Dichter network of FIG. 2 is employed. However, network outlets 111a and 111d (corresponding to network outlets 111a and 111d of FIG. 2) are modified so that all components are housed therein. In such a case, the splitter/combiner is a single low pass filter 21 and a single high pass filter 22. High pass filter 22 is coupled to single telephone-line modem/DCE 23. A single high pass filter, a single low pass filter, and a single DCE are used, since the connection to the telephone line involves a single point of connection. However, since point-to-point topology is not used in this case, modem 23 is expected to be more complex than in the other described embodiments. Each outlet 111 has standard telephone connector 14 for connecting the telephone set, and standard data connector 113 for the DTE connection. For example, a 10BaseT interface employing an RJ-45 connector can be used for the DTE connection.

Furthermore, although the present invention has so far been described with a single DTE connected to a single network outlet, multiple DTE units can be connected to a network outlet, as long as the corresponding node or DCE supports the requisite number of connections. Moreover, access to the communication media can be available for plurality of users using multiplexing techniques known in the art. In the case of time domain/division multiplexing (TDM) the whole bandwidth is dedicated to a specific user during a given time interval. In the case of frequency domain/division multiplexing (FDM), a number of users can share the media simultaneously, each using different non-overlapping portions of the frequency spectrum.

In addition to the described data communication purposes, a network according to the present invention can be used for control (e.g. home automation), sensing, audio, or video applications, and the communication can also utilize analog signals (herein denoted by the term "analog communication"). For example, a video signal can be transmitted in analog form via the network.

While the present invention has been described in terms of network outlets which have only two connections and therefore can connect only to two other network outlets (i.e., in a serial, or "daisy chain" configuration), the concept can also be extended to three or more connections. In such a case, each additional connecting telephone line must be broken at the network outlet, with connections made to the conductors thereof, in the same manner as has been described and illustrated for two segments. A splitter for such a multi-segment application should use one low pass filter and one high pass filter for each segment connection.

The present invention has also been described in terms of media having a single pair of wires, but can also be applied for more conductors. For example, ISDN employs two pairs for communication. Each pair can be used individually for a data communication network as described above.

Also as explained above, a network outlet 31 according to the invention (FIG. 3) has a connector 32 having at least four connection points. As an option, jumper 41 (FIG. 4), splitter 50 (FIG. 5), or splitter 50 with jumper 81 (FIG. 8), low pass filters, high pass filters, or other additional hardware may also be integrated or housed internally within network outlet 31. Moreover, the network outlet may contain standard connectors for devices, such as DTE units. In one embodiment, only passive components are included within the network outlet.

14

For example, splitter 50 can have two transformers and two capacitors (or an alternative implementation consisting of passive components). In another embodiment, the network outlet may contain active, power-consuming components. Three options can be used for providing power to such circuits:

1. Local powering: In this option, supply power is fed locally to each power-consuming network outlet. Such network outlets must be able to support connection for input power.

2. Telephone power: In both POTS and ISDN telephone networks, power is carried in the lines with the telephone signals. This power can also be used for powering the network outlet circuits, as long as the total power consumption does not exceed the POTS/ISDN system specifications. Furthermore, in some POTS systems the power consumption is used for OFF-HOOK/ON-HOOK signaling. In such a case, the network power consumption must not interfere with the telephone logic.

3. Dedicated power carried in the media: In this option, power for the data communication related components is carried in the communication media. For example, power can be distributed using 5 kHz signal. This frequency is beyond the telephone signal bandwidth, and thus does not interfere with the telephone service. The data communication bandwidth, however, be above this 5 kHz frequency, again ensuring that there is no interference between power and signals.

Upgrading existing telephone lines within a building can be done by the method illustrated in the flowchart of FIG. 12. At least two telephone outlets must be replaced by network outlets in order to support data communications. For each outlet to be replaced, the steps of FIG. 12 are performed as shown. In a step 122, the existing telephone outlet is mechanically removed from the wall. Next, in a step 124, the existing telephone outlet is electrically disconnected from the telephone line. At this point in a step 126, the existing telephone line is split or formed into two isolated segments. Depending on the existing configuration of the telephone line, this could be done by cutting the telephone line into two segments, by separating two telephone lines which had previously been joined at the existing telephone outlet, or by utilizing an unused wire pair of the existing telephone line as a second segment. Then, in a step 128, the two segments are electrically connected to a new network outlet, in a manner previously illustrated in FIG. 5, where one of the segments is connected to connector 54 and the other segment is connected to connector 55. Note that separating the telephone line into two segments is not necessary in all cases. If only two network outlets are desired, the telephone line does not have to be split, because a single segment suffices to connect the two network outlets. If more than two network outlets are desired, however, the telephone line must be split or formed into more than one segment. Finally, in a step 130 (FIG. 12), the network outlet is mechanically replaced and secured into the wall in place of the original telephone outlet.

While the above description describes the non-limiting case where two wire segments are connected to the outlet (such as outlets 11a, 11b, 11c and 11d), in general it is also possible to connect a single segment or more than two segments to the outlet.

In order to facilitate the upgrade of existing telephone systems for simultaneous telephony and data communications, the network outlets as described previously can be packaged in kit form with instructions for performing the method described above. As illustrated in FIG. 13, a basic kit contains two network outlets 132 and 134 with instructions

15

136, while supplementary kits need contain only a single network outlet 132. A network outlet 132 houses two standard data connectors 138 and 140, and a standard telephone connector 142, corresponding to connectors 57, 56, and 53, respectively, of FIG. 5. In addition, network outlet 132 has connectors 144 for electrically connecting to the segment of the telephone line. Connectors 144 correspond to connector 55 of FIG. 5 (connector 54 of FIG. 5 is omitted from FIG. 13 for clarity). Furthermore, network outlet 132 has flanges, such as a flange 146, for mechanically securing to a standard in-wall junction box. A homeowner could purchase a basic kit according to the present invention to upgrade an existing telephone system to a local area network, and then purchase whatever supplementary kits would be needed to expand the local area network to any degree desired.

While the invention has been described with respect to a limited number of embodiments, it will be appreciated that many variations, modifications and other applications of the invention may be made.

What is claimed is:

1. A digital access multiplexer apparatus for use with first, second and third telephone wire pairs, each telephone wire pair comprising two conductors and being connected to carry an analog telephone signal in an analog telephone frequency band and a bi-directional digital data signal in a digital data frequency band distinct from, and higher than, the analog telephone frequency band, said apparatus comprising:

first, second and third wiring connectors for respectively connecting to the first, second, and third telephone wire pairs;

first, second and third low pass filters respectively connected to said first, second, and third wiring connectors, each said low pass filter being operative to substantially pass only signals in the analog telephone frequency band;

a telephone connector connectable to a telephony device and connected to said first low pass filter;

first, second and third high pass filters respectively connected to said first, second, and third wiring connectors, each said high pass filter being operative to substantially pass only signals in the digital data frequency band;

first, second and third telephone line modems respectively connected to said first, second, and third high pass filters, each said telephone line modem being operative to bi-directionally communicate digital data with a single mating modem in the digital data frequency band;

a local area network connector connectable to a data unit;

a transceiver connected to said local area network connector for packet-based full-duplex communication with the data unit;

a router connected to said first, second and third telephone line modems and to said transceiver for sharing data therebetween; and

a single enclosure housing said first, second and third low pass filters, said first, second and third high pass filters, said second connector, said first, second and third telephone line modems, said local area network connector, said transceiver and said router.

2. The apparatus according to claim 1, wherein the transceiver is a local area network transceiver operative for point-to-point packet-based full-duplex communication with an identical mating transceiver.

3. The apparatus according to claim 2, wherein the point-to-point packet-based full-duplex communication conforms to IEEE802.3 standard and the local area network connector is RJ-45.

16

4. The apparatus according to claim 2, wherein the point-to-point packet-based full-duplex communication conforms to 10BaseT or 100BaseT.

5. The apparatus according to claim 1, wherein at least one of said telephone line modems is operative to conduct the digital data signal over a pre-existing POTS-service telephone wire pair installed at least in part in a residence.

6. The apparatus according to claim 5, wherein all of said telephone line modems are operative to conduct the digital data signal over a pre-existing POTS-service telephone wire pair installed at least in part in the residence.

7. The apparatus according to claim 1, wherein at least one of said telephone line modems is operative for full-duplex communication over a point-to-point pre-existing POTS-service telephone wire pair installed at least in part external to a building.

8. The apparatus according to claim 7, wherein all of said telephone line modems are operative for full duplex communication over a point-to-point pre-existing POTS-service telephone wire pair installed at least in part external to the building.

9. The apparatus according to claim 1, wherein at least one of said telephone line modems is DSL based.

10. The apparatus according to claim 9, wherein all of said telephone line modems are DSL based.

11. The apparatus according to claim 10, wherein all of said telephone line modems are ADSL based.

12. The apparatus according to claim 1, wherein the packet-based communication is based on Internet Protocol.

13. The apparatus according to claim 1, further comprising first, second and third terminators each connected between a respective one of said first, second and third high pass filters and a respective one of said first, second and third telephone line modems for substantially terminating a signal received from the respective of said first, second, and third telephone wire pairs in the digital data frequency band.

14. The apparatus according to claim 1, wherein said apparatus is attachable to a wall of a building.

15. The apparatus according to claim 14, wherein said apparatus is further mountable on an external wall of the building.

16. The apparatus according to claim 1, wherein said apparatus is at least partially housed within an outlet.

17. The apparatus according to claim 1, wherein said first, second and third wiring connectors are parts of a single connector assembly.

18. The apparatus according to claim 1, wherein said telephone connector is a standard telephone connector.

19. The apparatus according to claim 18, wherein said telephone connector is a RJ-11 type connector.

20. The apparatus according to claim 1, further using frequency division multiplexing, wherein: the digital data frequency band contains multiple distinct frequency sub-bands each carrying digital data; at least one of said telephone line modems is operative to conduct the digital data in the frequency sub-bands; and at least part of the data in each frequency sub-band is distinct from the data carried over the other frequency sub-bands.

21. The apparatus according to claim 1, further using frequency division multiplexing, wherein: the digital data frequency band contains multiple distinct frequency sub-bands each carrying digital data; all of said telephone line modems are operative to conduct the digital data in the frequency sub-bands; and at least part of the data in each frequency sub-band is distinct from the data carried over the other frequency sub-bands.

**17**

**22.** The apparatus according to claim **1** further using time division multiplexing, wherein: at least some digital data carried over of one of said telephone wire pairs contain multiple distinct data streams; and said apparatus is further operative to pass at least one of the data streams between said local area network connector and the respective wiring connector.

**23.** The apparatus according to claim **1**, further using time division multiplexing, wherein: the digital data carried over all of said telephone wire pairs contain multiple distinct data streams; and said apparatus is further operative to pass at least one of the data streams between said local area network connector and the respective wiring connector.

**24.** The apparatus according to claim **1**, wherein said first, second and third low pass filters are identical to each other, said first, second and third high pass filters are identical to each other, said first, second and third telephone line modems are identical to each other, and the same protocol is used for data conducted over said first, second and third telephone wire pairs.

**25.** The apparatus according to claim **1**, further being at least powered by a power signal carried over at least one of said telephone wire pairs.

**26.** The apparatus according to claim **25**, wherein the power signal is an AC power signal.

**27.** The apparatus according to claim **1**, further addressable in a digital data network.

**28.** The apparatus according to claim **27**, further addressable in a local area network.

**29.** A network for transporting digital data and analog telephone signals over multiple telephone wire pairs, the network comprising:

first, second and third telephone wire pairs, each comprising two conductors connected to conduct analog signals in an analog telephone frequency band and digital data in a respective digital data frequency band distinct from, and higher than, the analog telephone frequency band;

a digital access multiplexer device connected to said first, second and third telephone wire pairs, said digital access multiplexer device being connectable to a fourth digital data unit and to an analog telephone service and being operative for standard-based packet-based full-duplex communication with the fourth digital data unit, said digital access multiplexer device comprising a router operative to couple the digital data in the digital data frequency bands of said first, second and third telephone wire pairs to the fourth digital data unit, and said digital access multiplexer device being operative for coupling said analog signals in at least one of the analog telephone frequency bands to the analog telephone service; and

first, second and third remote devices, each connected to a respective one of said first, second and third telephone wire pairs, each of said remote devices being connectable to a respective one of the first, second and third digital data units and to an analog telephone set, and each being operative for standard-based packet-based full-duplex communication with the respective one of said first, second and third digital data units, and each remote device being operative to place digital data to and from a respective digital data unit in a respective digital data frequency band and to place analog signals to and from a respective analog telephone set in a respective analog telephone frequency band; and

wherein said digital access multiplexer device and each of said first, second and third remote devices is housed in a respective single enclosure.

**18**

**30.** The network according to claim **29**, wherein said digital access multiplexer device and each of said first, second and third remote devices are addressable in a digital data network.

**31.** The network according to claim **30**, wherein the digital data network is a local area network.

**32.** The network according to claim **29**, wherein the standard-based packet-based full-duplex communication conforms to IEEE802.3 standard and is based on Internet Protocol, and the connection to each of said digital data units is based on an RJ-45 connector.

**33.** The network according to claim **32**, wherein the standard-based packet-based full-duplex communication conforms to 10BaseT or 100BaseT standard.

**34.** The network according to claim **29**, wherein at least part of at least one of said telephone wire pairs comprises a pre-existing POTS-service telephone wire pair installed at least in part in a residence.

**35.** The network according to claim **29**, wherein at least part of at least one of said telephone wire pairs comprises a pre-existing POTS-service telephone wire pair installed at least in part outside of a building.

**36.** The network according to claim **29**, wherein the communication over at least one of said telephone wire pairs is DSL based.

**37.** The network according to claim **29**, wherein the communication over all of said telephone wire pairs is DSL based.

**38.** The network according to claim **29**, wherein the communication over all of said telephone wire pairs is ADSL based.

**39.** The network according to claim **29**, wherein the enclosure of at least one of said devices is attachable to a wall of a building.

**40.** The network according to claim **39**, wherein the enclosure of at least one of said devices is attachable to an external wall of a building.

**41.** The network according to claim **29**, wherein the enclosure of at least one of said devices is at least partially housed within an outlet.

**42.** The network according to claim **29**, wherein said first, second and third remote devices are identical to each other.

**43.** The network according to claim **29**, wherein the same protocol is used for communication over all of said telephone wire pairs.

**44.** The network according to claim **29**, wherein the digital data frequency band in which data is carried by at least one of said telephone wire pairs contains a plurality of distinct frequency sub-bands, and wherein at least part of the data in one frequency sub-band is distinct from the data carried over the other frequency sub-bands.

**45.** The network according to claim **29**, wherein the digital data frequency band in which data is carried by each of said telephone wire pairs contains a plurality of distinct frequency sub-bands, and wherein at least part of the data in one frequency sub-band is distinct from the data carried over the other frequency sub-bands.

**46.** The network according to claim **29**, wherein at least one of said telephone wire pairs is further connected to carry a power signal.

**47.** The network according to claim **46**, wherein at least one of said devices is connected to be at least in part powered by the power signal carried over said at least one of said telephone wire pairs.

**48.** The network according to claim **46**, wherein the power signal is an AC power signal.

US 7,522,714 B2

19                                                                20

**49**. The network according to claim **29**, wherein digital data carried by one of said telephone wire pairs in the digital data frequency band is different from digital data carried by other ones of said telephone wire pairs in the digital data frequency band.

**50**. The network according to claim **29**, wherein at least one of said telephone wire pairs is at least in part in a wall of a building and is terminated by a telephone outlet, and wherein a respective one of said remote devices is connected to said at least one of said telephone wire pairs via the telephone outlet.

**51**. The network according to claim **29**, wherein each of said telephone wire pairs connects said digital access multiplexer device and a respective one of said remote devices in a point-to-point connection.

**52**. The network according to claim **29**, wherein there are at least two of said digital access multiplexer devices, each located in a different building, and at least two of said remote devices are located in different buildings.

\*   \*   \*   \*   \*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED )<br>11 Hines Road )<br>Suite 203 )<br>Ottawa, Canada K2k 2x1 )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>HON. DAVID KAPPOS )<br>Under Secretary of Commerce for Intellectual )<br>Property and Director of the United States )<br>Patent and Trademark Office )<br>Madison Building )<br>600 Dulany Street )<br>Alexandria, VA 22314 )<br> )<br>Defendant. )<br> ) | Civil Action No. ---- |

# Exhibit B

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

ATTY.'S DOCKET:   BINDER7C

In re Application of:          )    Office of the Deputy
                               )    Commissioner for Patent
Yehuda BINDER                  )    Examination Policy
                               )
Patent No.:  7,522,714         )    Washington, D.C.
                               )
Patent Date:  April 21, 2009   )    Confirmation No. 8018
                               )
For: TELEPHONE OUTLET FOR …    )    June 22, 2009


REQUEST FOR RECONSIDERATION OF PATENT TERM ADJUSTMENT


Honorable Commissioner for Patents
U.S. Patent and Trademark Office
Customer Service Window
Randolph Building, Mail Stop Petitions
401 Dulany Street
Alexandria, VA 22314

Sir:

        Pursuant to 37 CFR 1.705(d), reconsideration of the
patent term adjustment indicated on the face of the above-
identified patent is hereby requested.

        In accordance with 37 CFR 1.705(b)(1), submitted
herewith is the fee of $200 as set forth in 37 CFR 1.18(e).
If there is any underpayment or any other fee necessary for
consideration of this request, please charge same to the
deposit account no. 02-4035 of the undersigned.

        The following statement of the facts involved is in
compliance with 37 CFR 1.705(b)(2).  The correct patent term
adjustment is 679 days.  The period of delay under 37 CFR

Patent No.:  7/522,714
Date: April 21, 2009


1.702(a) is 593 days, as properly calculated by the PTO. However, the PTO failed to take into account the period of delay under 37 CFR 1.702(b).  The period of time from January 25, 2009 (three years after the Filing or 371(c) date) to issuance of the patent on April 21, 2009, was 86 days.

37 CFR 1.703(f) provides that the periods of delay under 1.702 are added together "to the extent that such periods are not overlapping."  In *Wyeth v. Dudas*, 2008 U.S. Dist. LEXIS 76063, 88 USPQ2d 1538 (D.D.C. Sept. 30, 2008), the U.S. District Court for the District of Columbia held that only periods of actual calendar days overlap between the time periods of delay calculated under 1.702(a) and 1.702(b) are to be considered as overlap within the meaning of 1.703(f). Thus, in this case, there are no days of overlap as all of the 1.702(a) days of delay as shown on the "Patent Term Adjustments" page on the PAIR website for this patent are prior to January 25, 2009, which is the date that the delay under 1.702(b) commenced.  The 593 days of 1.702(a) delay that occurred prior to the commencement of the 1.702(b) delay must be added to the 86 days of delay under 37 CFR 1.702(b) to determine the total PTO delay, as per the interpretation required by the *Wyeth* court.

Thus, the period of patent term adjustment by the interpretation approved by the court in *Wyeth v. Dudas, supra*, is 679 days, minus any period attributed to applicant's delay

- 2 -

Patent No.:  7/522,714
Date: April 21, 2009


(37 CFR 1.704).  The PTO calculated applicant's delay as 0

days.  Thus, using the PTO's figures and the court's

interpretation, the correct period for patent term adjustment

should have been 679 days, i.e., 679 - 0 = 679 days.  No

terminal disclaimer has been filed in this case.

These issues could not have been raised on or before

the date of payment of the issue fee as the period of

adjustment under 1.702(b) did not become determined until the

patent issued.  Indeed, the PTO does not consider the effect

of the 1.702(b) period until it mails the issue notification.

Accordingly, this request for reconsideration of the patent

term adjustment is timely under 37 CFR 1.705(d).

Granting of this request and modifying the patent

term adjustment afforded this case to a total of 679 days are

therefore earnestly solicited.


Respectfully submitted,

BROWDY AND NEIMARK, P.L.L.C.
Attorneys for Applicant


By: /rlb/ _____
    Roger L. Browdy
    Registration No. 25,618

RLB:edg
Telephone No.: (202) 628-5197
Facsimile No.: (202) 737-3528


- 3 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>        Plaintiff,<br><br>               v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. ---- |

# Exhibit C

 UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Paper No.

BROWDY AND NEIMARK, P.L.L.C.
624 NINTH STREET, NW
SUITE 300
WASHINGTON DC 20001-5303

**MAILED**

AUG 20 2009

OFFICE OF PETITIONS

In re Patent No. 7,522,714   :
Binder                       :   DECISION ON
Issue Date:  April 21, 2009  :   REQUEST FOR
Application No. 11/338,855   :   RECONSIDERATION OF
Filed:    January 25, 2006   :   PATENT TERM ADJUSTMENT
Attorney Docket No. BINDER=7C :


This is a decision on the "REQUEST FOR RECONSIDERATION OF PATENT
TERM ADJUSTMENT," filed June 22, 2009, requesting that the
patent term adjustment determination for the above-identified
patent be changed from five hundred ninety-three (593) days to
six hundred and seventy-nine (679) days.

The request for reconsideration of patent term adjustment is
**DISMISSED**.

On April 21, 2009, the above-identified application matured into
US Patent No. 7,522,714 with a patent term adjustment of 593
days.  This request for reconsideration of patent term
adjustment was timely filed within two months of the issue date
of the patent.[1]  See 37 C.F.R. § 1.705(d).

The Office acknowledges submission of the $200.00 fee set forth
in 37 C.F.R. § 1.18(e).  No additional fees are required.

Patentees request recalculation of the patent term adjustment to
include a 86-day period of adjustment pursuant to 37 C.F.R.
§ 1.703(b).  Patentees maintain entitlement to a period of
adjustment due to the Three Year Delay by the Office, pursuant
to 37 CFR § 1.703(b), of 86 days and the period of adjustment
due to other examination delay, pursuant to 37 CFR
§ 1.702(a)(1), of 593 days.

---

[1] It is noted that June 21, 2009 fell on a Sunday.

Patent No. 7,522,714     Application No. 11/338,855       Page 2

The 86-day period is calculated based on the application having
been filed under 35 U.S.C. § 111(a) on January 25, 2006, and the
instant patent issued on April 21, 2009, which is 3 years and 86
days after its filing date.

Under 37 CFR § 1.703(f), Patentees are entitled to a period of
patent term adjustment equal to the period of delays based on
the grounds set forth in 37 CFR § 1.702 reduced by the period of
time equal to the period of time during which Patentees failed
to engage in reasonable efforts to conclude prosecution pursuant
to 37 CFR § 1.704.  In other words, the period of Office delay
reduced by the period of applicant delay.

The period of reduction of 0 days for applicant delay is not in
dispute.

The period of 593 days for Office delay is not in dispute.

Patentees do not dispute that the total period of Office delay
is the sum of the period of Three Years Delay (86 days) and the
period of Examination Delay (593 days) to the extent that these
periods of delay are not overlapping. However, Patentees contend
that there are no days of overlap between periods of delay under
37 C.F.R. § 1.702(a) and 37 C.F.R. § 1.702(b).  Accordingly,
Patentees submit that the total period of adjustment for Office
delay is 679 days, which is the sum of the period of Three Year
Delay (86 days) and the period of Examination Delay (593 days),
reduced by the period of overlap (0 days).

As such, Patentees assert entitlement to a patent term
adjustment of 679 days (86 + 593 reduced by 0 overlap - 0
(applicant delay)).

The Office agrees that the application issued 3 years and 86
days after its filing date.  The Office agrees that a certain
action was not taken within the specified time frame, and thus,
the entry of a period of adjustment of 593 days for Office delay
is correct.  At issue is whether Patentees should accrue 86 days
of patent term adjustment for the Office taking in excess of
three years to issue the patent (86 days less the 0 days of
overlap), as well as 593 days for Office failure to take a
certain action within a specified time frame (or examination
delay).

Patent No. 7,522,714      Application No. 11/338,855      Page 3

The Office contends that the entire 86-day period overlaps.
Patentees' calculation of the period of overlap is inconsistent
with the Office's interpretation of this provision.  35 U.S.C.
154(b)(2)(A) limits the adjustment of patent term, as follows:

> to the extent that the periods of delay attributable to
> grounds specified in paragraph (1) overlap, the period of
> any adjustment granted under this subsection shall not
> exceed the actual number of days the issuance of the
> patent was delayed.

Likewise, 37 CFR 1.703(f) provides that:

> To the extent that periods of delay attributable to the
> grounds specified in §1.702 overlap, the period of
> adjustment granted under this section shall not exceed the
> actual number of days the issuance of the patent was
> delayed.

As explained in *Explanation of 37 CFR 1.703(f) and of the United
States Patent and Trademark Office Interpretation of 35 U.S.C.
154(b)(2)(A)*, 69 Fed. Reg. 34283 (June 21, 2004), the Office
interprets 35 U.S.C. 154(b)(2)(A) as permitting either patent
term adjustment under 35 U.S.C. 154(b)(1)(A)(i)-(iv), or patent
term adjustment under 35 U.S.C. 154(b)(1)(B), but not as
permitting patent term adjustment under both 35 U.S.C.
154(b)(1)(A)(i)-(iv) and 154(b)(1)(B).  Accordingly, the Office
implements the overlap provision as follows:

> If an application is entitled to an adjustment under 35
> U.S.C. 154(b)(1)(B), the entire period during which the
> application was pending (except for periods excluded under
> 35 U.S.C. 154(b)(1)(B)(i)-(iii)), and not just the period
> beginning three years after the actual filing date of the
> application, is the period of delay under 35 U.S.C.
> 154(b)(1)(B) in determining whether periods of delay
> overlap under 35 U.S.C. 154(b)(2)(A).  Thus, any days of
> delay for Office issuance of the patent more than 3 years
> after the filing date of the application, which overlap
> with the days of patent term adjustment accorded prior to
> the issuance of the patent will not result in any
> additional patent term adjustment.  See 35 U.S.C.
> 154(b)(1)(B), 35 U.S.C. 154(b)(2)(A), and 37 CFR
> § 1.703(f).  See *Changes to Implement Patent Term
> Adjustment Under Twenty Year Term; Final Rule*, 65 Fed. Reg.

Patent No. 7,522,714      Application No. 11/338,855      Page 4

56366 (Sept. 18, 2000). See also *Revision of Patent Term
Extension and Patent Term Adjustment Provisions; Final
Rule*, 69 Fed. Reg. 21704 (April 22, 2004), 1282 Off. Gaz.
Pat. Office 100 (May 18, 2004). See also *Explanation of 37
CFR 1.703(f) and of the United States Patent and Trademark
Office Interpretation of 35 U.S.C. 154(b)(2)(A)*, 69 Fed.
Reg. 34283 (June 21, 2004).

The current wording of § 1.703(f) was revised in response to the
misinterpretation of this provision by a number of Patentees.
The rule was slightly revised to more closely track the
corresponding language of 35 U.S.C. 154(b)(2)(A). The relevant
portion differs only to the extent that the statute refers back
to provisions of the statute whereas the rule refers back to
sections of the rule. This was not a substantive change to the
rule nor did it reflect a change of the Office's interpretation
of 35 U.S.C. 154(b)(2)(A). As stated in the *Explanation of 37
CFR 1.703(f) and of the United States Patent and Trademark
Office Interpretation of 35 U.S.C. 154(b)(2)(A)*, the Office has
consistently taken the position that if an application is
entitled to an adjustment under the three-year pendency
provision of 35 U.S.C. 154(b)(1)(B), the entire period during
which the application was pending before the Office (except for
periods excluded under 35 U.S.C. 154(b)(1)(B)(i)-(iii)), and not
just the period beginning three years after the actual filing
date of the application, is the relevant period under 35 U.S.C.
154(b)(1)(B) in determining whether periods of delay "overlap"
under 35 U.S.C. 154(b)(2)(A).

This interpretation is consistent with the statute. Taken
together the statute and rule provide that to the extent that
periods of delay attributable to grounds specified in 35 U.S.C.
154(b)(1) and in corresponding 37 C.F.R. § 1.702 overlap, the
period of adjustment granted shall not exceed the actual number
of days the issuance of the patent was delayed. The grounds
specified in these sections cover the A) guarantee of prompt
Patent and Trademark Office responses, B) guarantee of no more
than 3 year application pendency, and C) guarantee or
adjustments for delays due to interference, secrecy orders and
appeals. A section by section analysis of 35 U.S.C.
154(b)(2)(A) specifically provides that:

Section 4402 imposes limitations on restoration of term.
In general, pursuant to [35 U.S.C.] 154(b)(2)(A)-(C), total
adjustments granted for restorations under [35 U.S.C.

154](b)(1) are reduced as follows:   (1) To the extent that
there are multiple grounds for extending the term of a
patent that may exist simultaneously (e.g., delay due to a
secrecy order under [35 U.S.C.] 181 and administrative
delay under [35 U.S.C.] 154(b)(1)(A)), the term should not
be extended for each ground of delay but only for the
actual number of days that the issuance of a patent was
delayed; See 145 Cong. Rec. S14,718[2]

As such, the period for over 3 year pendency does not overlap
only to the extent that the actual dates in the period beginning
three years after the date on which the application was filed
overlap with the actual dates in the periods for failure of the
Office to take action within specified time frames.   In other
words, consideration of the overlap does not begin three years
after the filing date of the application.

In this instance, the relevant period under 35 U.S.C.
154(b)(1)(B) in determining whether periods of delay "overlap"
under 35 U.S.C. 154(b)(2)(A) is the entire period during which
the application was pending before the Office, January 25, 2006
to April 21, 2009.   593 days of patent term adjustment were
accorded prior to the issuance of the patent for the Office
failing to respond within a specified time frame during the
pendency of the application.   All of the 86 days for Office
delay in issuing the patent overlap with the 593 days of Office
delay.   During that time, the issuance of the patent was delayed
by 593 days, not (593 + 86) days.   Other than the period of
Office delay pursuant to 37 C.F.R. § 1.702(a)(1) which totals
593 days, the Office took all actions set forth in 37 C.F.R.
§ 1.702(a) within the prescribed timeframes.

Nonetheless, given the initial 593 days of Office delay and the
0 days of applicant delay and the time allowed within the time
frames for processing and examination, the patent issued three
years and 86 days after its filing date.   The Office did not
delay 593 days and then an additional 86 days.   The 86 days
attributed to the delay in the issuance of the patent overlaps
with the adjustment of 593 days attributable to the grounds
specified in 37 C.F.R. § 1.702(a)(1).   Accordingly, at issuance,

---

[2]    The AIPA is title IV of the Intellectual Property and Communications Omnibus Reform Act of
1999 (S. 1948), which was incorporated and enacted as law as part of Pub. L. 106-113.   The
Conference Report for H.R. 3194, 106th Cong. 1st Sess. (1999), which resulted in Pub. L. 106-113,
does not contain any discussion (other than the incorporated language) of S. 1948.   A section-by-
section analysis of S. 1948, however, was printed in the Congressional Record at the request of
Senator Lott, See 145 Cong. Rec. S14,708-26 (1999) (daily ed. Nov. 17, 1999).

Patent No. 7,522,714     Application No. 11/338,855     Page 6

the Office properly entered no additional days of patent term
adjustment for the Office taking in excess of 3 years to issue
the patent.  593 days is determined to be the actual number of
days that the issuance of the patent was delayed, considering
the 86 days over three years to the issuance of this patent.

In view thereof, no adjustment to the patent term will be made.

Telephone inquiries specific to this matter should be directed
to Paul Shanoski, Senior Attorney, at (571) 272-3225.

*C. P. Donnell for*

Anthony Knight
Supervisor
Office of Petitions

## STATUTE AND REGULATION

**35 U.S.C. § 154(b)** as amended by § 4402 of the American
Inventors Protection Act of 1999[3] (AIPA) provides that:

ADJUSTMENT OF PATENT TERM. —
(1)  PATENT TERM GUARANTEES. —
(A)  GUARANTEE OF PROMPT PATENT AND TRADEMARK
OFFICE RESPONSES. — Subject to the limitations under
paragraph (2), if the issue of an original patent is
delayed due to the failure of the Patent and Trademark
Office to —
(i)   provide at least one of the notifications under
section 132 of this title or a notice of allowance under
section 151 of this title not later than 14 months
after —
(I)   the date on which an application was filed under
section 111(a) of this title; or
(II)  the date on which an international application
fulfilled the requirements of  section 371 of this title;
(ii)  respond to a reply under  section 132, or to an
appeal taken under section 134, within 4  months after the
date on which the reply was filed or the appeal was taken;
(iii) act on an application within 4  months after the
date of a decision by the Board of Patent Appeals and
Interferences under section 134 or 135 or a decision by a
Federal court under section 141,  145, or 146 in a case in
which allowable claims remain in the application; or
(iv)  issue a patent within 4 months after the date on
which the issue fee was paid under  section 151 and all
outstanding requirements were satisfied, the term of the
patent shall be extended 1 day for each day after the end
of the period specified in clause (i), (ii), (iii), or
(iv), as the case may be, until the action described
in such clause is taken.

(B)   GUARANTEE OF NO MORE THAN 3-YEAR APPLICATION
PENDENCY. — Subject to the limitations under paragraph (2),
if the issue of an original patent is delayed due to the
failure of the United States Patent and Trademark Office to
issue a patent within 3 years after the actual filing date
of the application in the United States, not including —

---

[3]   Public Law 106-113, 113 Stat. 1501, 1501A-557 through 1501A-560 (1999).

(i)   any time consumed by continued examination of the application requested by the applicant under  section 132(b);

(ii)   any time consumed by a proceeding under  section 135(a), any time consumed by the imposition of an order under section 181, or any time consumed by appellate review by the Board of Patent Appeals and Interferences or by a Federal court; or

(iii) any delay in the processing of the application by the United States Patent and Trademark Office requested by the applicant except as permitted by paragraph (3)(C), the term of the patent shall be extended 1 day for each day after the end of that 3-year period until the patent is issued.

(C)   GUARANTEE OR ADJUSTMENTS FOR DELAYS DUE TO INTERFERENCES, SECRECY ORDERS, AND APPEALS. – Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to –

(i)   a proceeding under section 135(a);

(ii)   the imposition of an order under  section 181; or

(iii) appellate review by the Board of Patent Appeals and Interferences or by a Federal court in a case in which the patent was issued under a decision in the review reversing an adverse determination of patentability, the term of the patent shall be extended 1 day for each day of the pendency of the proceeding, order, or review, as the case may be.

(2)   LIMITATIONS. –

(A)   IN GENERAL. – To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

The implementing regulation, 37 CFR § 1.702, provides grounds for adjustment of patent term due to examination delay under the Patent Term Guarantee Act of 1999 (original applications, other than designs, filed on or after May 29, 2000).

(a)   Failure to take certain actions within specified time frames.  Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be

adjusted if the issuance of the patent was delayed due to
the failure of the Office to:
    (1)    Mail at least one of a notification under 35
U.S.C. 132 or a notice of allowance under 35 U.S.C. 151 not
later than fourteen months after the date on which the
application was filed under 35 U.S.C. 111(a) or fulfilled
the requirements of 35 U.S.C. 371 in an international
application;
    (2)    Respond to a reply under 35 U.S.C. 132 or to an
appeal taken under 35 U.S.C. 134 not later than four months
after the date on which the reply was filed or the appeal
was taken;
    (b)    Failure to issue a patent within three years of
the actual filing date of the application. Subject to the
provisions of 35 U.S.C. 154(b) and this subpart, the term
of an original patent shall be adjusted if the issuance of
the patent was delayed due to the failure of the Office to
issue a patent within three years after the date on which
the application was filed under 35 U.S.C. 111(a) or the
national stage commenced under 35 U.S.C. 371(b) or (f) in
an international application, but not including[4]:

In pertinent part, 37 CFR § 1.703 provides for calculation of
the periods, as follows:

Period of adjustment of patent term due to examination delay.
    (a)    The period of adjustment under § 1.702(a) is the
sum of the following periods:
    (1)    The number of days, if any, in the period
beginning on the day after the date that is fourteen months
after the date on which the application was filed under
35 U.S.C. 111(a) or fulfilled the requirements of 35 U.S.C.
371 and ending on the date of mailing of either an action
under 35 U.S.C. 132, or a notice of allowance under 35
U.S.C. 151, whichever occurs first;

    (b) The period of adjustment under § 1.702(b) is the
number of days, if any, in the period beginning on the day

---

[4]     (1)  Any time consumed by continued examination of the application under 35
U.S.C. 132(b);
        (2)  Any time consumed by an interference proceeding under 35 U.S.C. 135(a);
        (3)  Any time consumed by the imposition of a secrecy order under 35 U.S.C. 181;
        (4)  Any time consumed by review by the Board of Patent Appeals and Interferences or a
Federal court; or
        (5)  Any delay in the processing of the application by the Office that was requested by
the applicant.

after the date that is three years after the date on which
the application was filed under 35 U.S.C. 111(a) or the
national stage commenced under 35 U.S.C. 371(b) or (f) in
an international application and ending on the date a
patent was issued, but not including the sum of the
· following periods[5]:

37 CFR 1.703(f) provides that:

The adjustment will run from the expiration date of the
patent as set forth in 35 U.S.C. 154(a)(2). To the extent
that periods of delay attributable to the grounds
specified in §1.702 overlap, the period of adjustment
granted under this section shall not exceed the actual
number of days the issuance of the patent was delayed. The
term of a patent entitled to adjustment under § 1.702 and
this section shall be adjusted for the sum of the periods
calculated under paragraphs (a) through (e) of this
section, to the extent that such periods are not
overlapping, less the sum of the periods calculated under
§ 1.704. The date indicated on any certificate of mailing
or transmission under § 1.8 shall not be taken into account
in this calculation.

---

[5]  (1) The number of days, if any, in the period beginning on the date on which a request for
continued examination of the application under 35 U.S.C. 132(b) was filed and ending on the date
the patent was issued;
       (2)(i) The number of days, if any, in the period beginning on the date an interference was
declared or redeclared to involve the application in the interference and ending on the date that
the interference was terminated with respect to the application; and (ii) The number of days, if
any, in the period beginning on the date prosecution in the application was suspended by the
Office due to interference proceedings under 35 U.S.C. 135(a) not involving the application and
ending on the date of the termination of the suspension;
       (3)(i) The number of days, if any, the application was maintained in a sealed condition under
35 U.S.C. 181; (ii) The number of days, if any, in the period beginning on the date of mailing of
an examiner's answer under § 41.39 of this title in the application under secrecy order and
ending on the date the secrecy order was removed; (iii) The number of days, if any, in the period
beginning on the date applicant was notified that an interference would be declared but for the
secrecy order and ending on the date the secrecy order was removed; and (iv)  The number of days,
if any, in the period beginning on the date of notification under § 5.3(c) of this chapter and
ending on the date of mailing of the notice of allowance under 35 U.S.C. 151; and,
       (4) The number of days, if any, in the period beginning on the date on which a notice of
appeal to the Board of Patent Appeals and Interferences was filed under 35 U.S.C. 134 and § 41.31
of this title and ending on the date of the last decision by the Board of Patent Appeals and
Interferences or by a Federal court in an appeal under 35 U.S.C. 141 or a civil action under 35
U.S.C. 145, or on the date of mailing of either an action under 35 U.S.C. 132, or a notice of
allowance under 35 U.S.C. 151, whichever occurs first, if the appeal did not result in a decision
by the Board of Patent Appeals and Interferences.

Patent No. 7,522,714       Application No. 11/338,855       Page 7

**STATUTE AND REGULATION**

35 U.S.C. § 154(b) as amended by § 4402 of the American
Inventors Protection Act of 1999[3] (AIPA) provides that:

      ADJUSTMENT OF PATENT TERM. —
      (1)   PATENT TERM GUARANTEES. —
      (A)   GUARANTEE OF PROMPT PATENT AND TRADEMARK
OFFICE RESPONSES. — Subject to the limitations under
paragraph (2), if the issue of an original patent is
delayed due to the failure of the Patent and Trademark
Office to —
      (i)    provide at least one of the notifications under
section 132 of this title or a notice of allowance under
section 151 of this title not later than 14 months
after —
      (I)    the date on which an application was filed under
section 111(a) of this title; or
      (II) the date on which an international application
fulfilled the requirements of  section 371 of this title;
      (ii)   respond to a reply under  section 132, or to an
appeal taken under section 134, within 4 ` months after the
date on which the reply was filed or the appeal was taken;
      (iii) act on an application within 4  months after the
date of a decision by the Board of Patent Appeals and
Interferences under section 134 or 135 or a decision by a
Federal court under section 141,  145, or 146 in a case in
which allowable claims remain in the application; or
      (iv)   issue a patent within 4 months after the date on
which the issue fee was paid under  section 151 and all
outstanding requirements were satisfied, the term of the
patent shall be extended 1 day for each day after the end
of the period specified in clause (i), (ii), (iii), or
(iv), as the case may be, until the action described
in such clause is taken.

      (B)   GUARANTEE OF NO MORE THAN 3-YEAR APPLICATION
PENDENCY. — Subject to the limitations under paragraph (2),
if the issue of an original patent is delayed due to the
failure of the United States Patent and Trademark Office to
issue a patent within 3 years after the actual filing date
of the application in the United States, not including —

---

[3]   Public Law 106-113, 113 Stat. 1501, 1501A-557 through 1501A-560 (1999).

(i)   any time consumed by continued examination of
the application requested by the applicant under  section
132(b);
(ii)  any time consumed by a proceeding under  section
135(a), any time consumed by the imposition of an order
under section 181, or any time consumed by appellate review
by the Board of Patent Appeals and Interferences or by a
Federal court; or
(iii) any delay in the processing of the application
by the United States Patent and Trademark Office requested
by the applicant except as permitted by paragraph (3)(C),
the term of the patent shall be extended 1 day for each day
after the end of that 3-year period until the patent is
issued.

(C)   GUARANTEE OR ADJUSTMENTS FOR DELAYS DUE TO
INTERFERENCES, SECRECY ORDERS, AND APPEALS. — Subject to
the limitations under paragraph (2), if the issue of an
original patent is delayed due to —
(i)   a proceeding under section 135(a);
(ii)  the imposition of an order under  section 181;
or
(iii) appellate review by the Board of Patent Appeals
and Interferences or by a Federal court in a case in which
the patent was issued under a decision in the review
reversing an adverse determination of patentability, the
term of the patent shall be extended 1 day for each day of
the pendency of the proceeding, order, or review, as the
case may be.

(2)   LIMITATIONS. —
(A)   IN GENERAL. — To the extent that periods of
delay attributable to grounds specified in paragraph (1)
overlap, the period of any adjustment granted under this
subsection shall not exceed the actual number of days the
issuance of the patent was delayed.

The implementing regulation, 37 CFR § 1.702, provides grounds
for adjustment of patent term due to examination delay under the
Patent Term Guarantee Act of 1999 (original applications, other
than designs, filed on or after May 29, 2000).

(a)   Failure to take certain actions within specified
time frames.  Subject to the provisions of 35 U.S.C. 154(b)
and this subpart, the term of an original patent shall be

adjusted if the issuance of the patent was delayed due to the failure of the Office to:

(1)   Mail at least one of a notification under 35 U.S.C. 132 or a notice of allowance under 35 U.S.C. 151 not later than fourteen months after the date on which the application was filed under 35 U.S.C. 111(a) or fulfilled the requirements of 35 U.S.C. 371 in an international application;

(2)   Respond to a reply under 35 U.S.C. 132 or to an appeal taken under 35 U.S.C. 134 not later than four months after the date on which the reply was filed or the appeal was taken;

(b)   Failure to issue a patent within three years of the actual filing date of the application. Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be adjusted if the issuance of the patent was delayed due to the failure of the Office to issue a patent within three years after the date on which the application was filed under 35 U.S.C. 111(a) or the national stage commenced under 35 U.S.C. 371(b) or (f) in an international application, but not including[4]:

In pertinent part, 37 CFR § 1.703 provides for calculation of the periods, as follows:

Period of adjustment of patent term due to examination delay.

(a)   The period of adjustment under § 1.702(a) is the sum of the following periods:

(1)   The number of days, if any, in the period beginning on the day after the date that is fourteen months after the date on which the application was filed under 35 U.S.C. 111(a) or fulfilled the requirements of 35 U.S.C. 371 and ending on the date of mailing of either an action under 35 U.S.C. 132, or a notice of allowance under 35 U.S.C. 151, whichever occurs first;

(b) The period of adjustment under § 1.702(b) is the number of days, if any, in the period beginning on the day

---

[4]   (1)   Any time consumed by continued examination of the application under 35 U.S.C. 132(b);

(2)   Any time consumed by an interference proceeding under 35 U.S.C. 135(a);

(3)   Any time consumed by the imposition of a secrecy order under 35 U.S.C. 181;

(4)   Any time consumed by review by the Board of Patent Appeals and Interferences or a Federal court; or

(5)   Any delay in the processing of the application by the Office that was requested by the applicant.

after the date that is three years after the date on which
the application was filed under 35 U.S.C. 111(a) or the
national stage commenced under 35 U.S.C. 371(b) or (f) in
an international application and ending on the date a
patent was issued, but not including the sum of the
following periods[5]:

37 CFR 1.703(f) provides that:

The adjustment will run from the expiration date of the
patent as set forth in 35 U.S.C. 154(a)(2). To the extent
that periods of delay attributable to the grounds
specified in §1.702 overlap, the period of adjustment
granted under this section shall not exceed the actual
number of days the issuance of the patent was delayed. The
term of a patent entitled to adjustment under § 1.702 and
this section shall be adjusted for the sum of the periods
calculated under paragraphs (a) through (e) of this
section, to the extent that such periods are not
overlapping, less the sum of the periods calculated under
§ 1.704. The date indicated on any certificate of mailing
or transmission under § 1.8 shall not be taken into account
in this calculation.

---

[5] (1) The number of days, if any, in the period beginning on the date on which a request for
continued examination of the application under 35 U.S.C. 132(b) was filed and ending on the date
the patent was issued;
    (2)(i) The number of days, if any, in the period beginning on the date an interference was
declared or redeclared to involve the application in the interference and ending on the date that
the interference was terminated with respect to the application; and (ii) The number of days, if
any, in the period beginning on the date prosecution in the application was suspended by the
Office due to interference proceedings under 35 U.S.C. 135(a) not involving the application and
ending on the date of the termination of the suspension;
    (3)(i) The number of days, if any, the application was maintained in a sealed condition under
35 U.S.C. 181; (ii) The number of days, if any, in the period beginning on the date of mailing of
an examiner's answer under § 41.39 of this title in the application under secrecy order and
ending on the date the secrecy order was removed; (iii) The number of days, if any, in the period
beginning on the date applicant was notified that an interference would be declared but for the
secrecy order and ending on the date the secrecy order was removed; and (iv) The number of days,
if any, in the period beginning on the date of notification under § 5.3(c) of this chapter and
ending on the date of mailing of the notice of allowance under 35 U.S.C. 151; and,
    (4) The number of days, if any, in the period beginning on the date on which a notice of
appeal to the Board of Patent Appeals and Interferences was filed under 35 U.S.C. 134 and § 41.31
of this title and ending on the date of the last decision by the Board of Patent Appeals and
Interferences or by a Federal court in an appeal under 35 U.S.C. 141 or a civil action under 35
U.S.C. 145, or on the date of mailing of either an action under 35 U.S.C. 132, or a notice of
allowance under 35 U.S.C. 151, whichever occurs first, if the appeal did not result in a decision
by the Board of Patent Appeals and Interferences.